# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

EDDIE BROWN,

Defendant-Appellant.

FOR PUBLICATION
October 23, 2018
9:00 a.m.

No. 339318
Oakland Circuit Court
LC No. 2010-232531-FC

Before: MURRAY, C.J., and BORRELLO and RONAYNE KRAUSE, JJ.

RONAYNE KRAUSE, J.

Defendant appeals as of right his jury convictions of three counts of first-degree criminal sexual conduct (CSC-I), one under MCL 750.520b(1)(a) (sexual penetration of a victim less than 13 years of age) and two under MCL 750.520b(1)(b)(*i*) (sexual penetration of a victim at least 13 but less than 16 years of age and a member of the same household), and one count of second-degree criminal sexual conduct (CSC-II), MCL 750.520b(1)(b)(*i*) (sexual contact with a victim at least 13 but less than 16 years of age and a member of the same household). The trial court sentenced defendant as both a second-offense habitual offender, MCL 769.11, and as a second CSC-I offender against a minor under the age of 13 with respect to one count of CSC-I, MCL 750.520b(2)(c), and as a second CSC-I offender with respect to the other two counts of CSC-I, MCL 750.520f, imposing sentences of life in prison for the CSC-I conviction under § 520(1)(a), 10 to 40 years in prison for each CSC-I conviction under § 520(1)(b)(*i*), and 5 to 22-1/2 years in prison for the CSC-II conviction, to be served concurrently. We affirm.

## I. FACTS AND EVIDENCE

Defendant sexually abused the victim when she was 12 and 13 years old and lived in the same house as defendant. Defendant was the victim's mother's boyfriend, and he began living in the victim's home while her mother was pregnant with defendant's child. The sexual abuse took place multiple times over the course of approximately 5 months, beginning with odd, inappropriate statements to the victim in January of 2010, and culminating in a final act of sexual assault on or about May 5, 2010. Defendant initially made statements to the victim along the lines of wishing she was her mother, defendant's girlfriend, and other unsettling phrases. The first instance of physical sexual assault took place in February when the victim was still 12 years old. Defendant, under the guise of punishment for talking to boys, forced the victim to lift her shirt and allow him to put her breasts into his mouth. He then ordered the victim to lie down on

-1-

the bathroom floor and remove her pants. Defendant then performed cunnilingus on the victim. Defendant's first charge, CSC I penetration of a victim under the age of 13, and fourth charge, CSC II, sexual contact on a victim under 13 and residing in the same household, arise from this first assault. This was defendant's second CSC I conviction for penetration of a victim under the age of 13, invoking an automatic sentence of life.

Charges two and three, CSC I with a victim between the ages of 13 and 16 who resides within the same household, involved anal and oral penetration of the victim after her 13th birthday. Defendant forced the victim on at least one occasion to perform fellatio on him, again under the guise of punishment. Defendant would show up in the victim's room in the early morning hours and often hover or sit on the edge of the bed until the victim woke. Defendant, on at least one occasion, offered the victim a choice between performing oral sex on him and having him perform oral sex on her. On or about May 5, 2010, the final assault took place in the early morning hours. Defendant penetrated the victim anally, required the victim to pull down her night shirt, and ejaculated onto her breast. Subsequently, the victim told her best friend at the bus stop that morning that she didn't feel well because defendant had kept her up all night and that defendant had assaulted her again. She then borrowed her friend's cell phone in order to message another friend, a boy who lived down the street, that she had been assaulted again. Her friend then told the victim's aunt about the abuse while she was babysitting the victim and her siblings that evening. The victim then told her aunt about the abuse herself. The aunt then went inside and told her fiancé, the victim's uncle, about the abuse.

The victim then disclosed to her aunt and uncle that defendant had staged and taken several indecent photographs of her with his old cellphone. The victim helped her uncle to locate the old phone used to take the photographs. Her uncle put the phone in his pocket, but was unable to view the phone's contents because it was locked by a password. A short time later the victim's mother and defendant returned home after an evening of running errands. The victim's mother had to return to the store, and the victim's brother offered to ride with her. Defendant, presumably having noticed the general mood and startled by the uncle's behavior, began to frantically search for the old phone. On the way home from the store the victim's uncle informed her mother of what the victim had told him and that he was in possession of the old phone.

Driving back towards home, the two of them noticed defendant out looking for his phone. The victim and her aunt left the house and were in the process of getting in the uncle's car when defendant approached and asked where the victim was going on a school night. Nothing was said and the victim went to her uncle's house for safety. Defendant repeatedly called the uncle's phone asking to speak with the victim. Defendant then left in the mother's van, not informing anyone of where he was going. The uncle returned to his sister's, the victim's mothers, house and she unlocked the phone. The two of them verified the pictures existed. Late the next evening or early on the day after, a police report was made.

At trial, the prosecution presented testimony from the victim regarding the charged instances of sexual abuse, as well as her testimony that defendant took photographs of her with his cell phone. The prosecution introduced four photographs of the victim that were recovered from defendant's phone. The prosecution additionally presented text messages from the victim disclosing the abuse, as well as the testimony of witnesses who corroborated the circumstances

surrounding the victim's disclosure of the abuse. The prosecution further presented the testimony of a sexual assault nurse examiner regarding her examination of the victim and the victim's statements. A jury found defendant guilty of the charged offenses.

## II. ADMISSION OF PHOTOGRAPHS

Defendant argues that he was denied a fair trial by the admission of indecent photographs depicting the 12-year-old victim's vagina, breasts, and buttocks. We disagree.

### A. PRESERVATION AND STANDARD OF REVIEW

"In order to preserve the issue of the improper admission of evidence for appeal, a party generally must object at the time of admission." *People v Knox*, 469 Mich 502, 508; 674 NW2d 366 (2004). At trial, defendant objected to the prosecution's request to admit 11 photographs of the victim from defendant's phone, arguing that the photographs were more prejudicial than probative because of their graphic nature, and the victim could testify regarding the photographs. The trial court allowed the prosecution to introduce 4 of the proffered 11 photographs. Accordingly, defendant's evidentiary claim is preserved. However, because defendant did not raise an objection on the ground that the admission of the photographs allegedly denied him a fair trial, his constitutional claim is unpreserved. See *People v Canter*, 197 Mich App 550, 563; 496 NW2d 336 (1992).

"A trial court's decision to admit evidence will not be disturbed absent an abuse of discretion." *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *People v McBurrows*, 322 Mich App 404, 411; 913 NW2d 342 (2017) (citation and quotation marks omitted). Unpreserved claims of constitutional error are reviewed for plain error affecting a defendant's substantial rights. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999).

### B. ANALYSIS

"Photographic evidence is generally admissible as long as it is relevant, MRE 401, and not unduly prejudicial, MRE 403." *People v Gayheart*, 285 Mich App 202, 227; 776 NW2d 330 (2009). "Exclusion is required under MRE 403 only when the danger of unfair prejudice substantially outweighs the probative value of the evidence." *People v Head*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 334255), lv pending; slip op at 6. "Photographs may be used to corroborate a witness's testimony[.]" *Head*, ___ Mich App at ___; slip op at 7.

In ruling on the prosecution's request to admit 11 of the 45 photographs of the victim found on defendant's phone, the trial court stated that several of the photographs were "repulsive." The court ruled that the prosecution could only use the photographs in which the victim could identify defendant's hands in the photos. The court refused to admit the other photographs as cumulative and too prejudicial because testimony would be sufficient. Accordingly, the court admitted only People's Exhibits 12 through 15. In each photograph, the victim identified herself or her vagina, as well as defendant's hand. With regard to the first three photographs, she testified that each was taken by defendant.

Trial courts have a duty, at times an unpleasant one, to resolve questions of admissibility of evidence in cases that run the gamut of antisocial behavior. Doing so sometimes requires the consideration of evidence that a law-abiding member of society would find repulsive, indecent, obscene, or would rather not acknowledge exists. Were this Court to hold that evidence could be excluded for the mere reason that it was unpleasant to consider, evidence of the most probative value might then be excluded from the most heinous of cases.

> Generally, photographs that are merely calculated to arouse the sympathies or prejudices of the jury should not be admitted. However, if a photograph is otherwise admissible for a proper purpose, it is not rendered inadmissible merely because it brings vividly to the jurors the details of a gruesome or shocking accident or crime. [*People v Howard*, 226 Mich App 528, 549-550; 575 NW2d 16 (1997) (citations omitted).]

The sexual assault of a child is condemned so strongly by society that the mere possession of photographic representations of such acts is a felony punished similarly to murder, robbery, and other serious crimes. See MCL 750.145c. The photographs in this case are shocking, indecent, and unsettling. However, they are illustrative of not only the acts depicted, but of the propensities of the individual who took them, and they were not introduced merely to shock or inflame the jurors. The photographs corroborated the victim's testimony that defendant took the photographs, given the victim's ability to identify defendant's hands, and that defendant had a clear sexual interest in the victim. *Head*, ___ Mich App at ___; slip op at 7. They also serve to corroborate the victim's testimony in a more general sense, because they are the only direct evidence confirming any part of the victim's testimony. *Id*. Therefore, any prejudicial taint is more than overcome by their probative value, regardless of how lurid and despicable the photographs themselves may be.

Moreover, a holding that the opposite were true would require this Court to conclude that the trial court had abused its discretion in allowing the photographs to be admitted. Given the trial court's careful consideration of the photographs, its decision to vastly limit the number that could be admitted at trial, and its requirement that the victim be able to identify the defendant's hands in the admitted photographs, we instead conclude that the trial court acted well within its discretion. Although the photographs were perhaps the most wrenching of the evidence against defendant, they served merely to corroborate the testimony of the defendant. *Id*. Given our holding that the photographs' probative value far outweighs any prejudice, their admission at trial was proper.

Because application of MRE 403 to any photographs that a party seeks to admit requires a balancing act of factors, we emphasize that sexually explicit photographs used as evidence of a sexual assault of a minor *cannot be unfairly prejudicial per se*. As our prior decisions have indicated, and as the trial court did in this case, trial courts must weigh the prohibitive value against the danger of any unfair prejudice that admission might cause. A decision on the admissibility of photographs in such cases cannot be based solely on the graphic nature of the photographs. See, e.g., *Howard*, 226 Mich App at 549-550; *Head*, ___ Mich App at ___; slip op at 7.

## III. QUALIFICATION OF EXPERT WITNESS

Next, defendant argues that the trial court committed errors requiring reversal by qualifying the prosecution's witness, nurse Katrina Sadowski, as an expert in sexual abuse trauma and by admitting her testimony when she was not certified by the state as a Sexual Assault Nurse Examiner (SANE). We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

Defendant objected at trial to the qualification of Sadowski, but he did not object to her testimony regarding the absence of injury in most sexual assault cases or the victim's body language. Therefore, defendant preserved his challenge to Sadowski's qualification as an expert generally, but he did not preserve his remaining challenges to her testimony. See *Knox*, 469 Mich at 508; *Canter*, 197 Mich App at 563. This Court reviews for an abuse of discretion a trial court's decision on an expert's qualifications, as well as a trial court's decision to admit or exclude expert witness testimony. *People v Dixon-Bey*, 321 Mich App 490, 496; 909 NW2d 458 (2017). "Unpreserved claims of evidentiary error are reviewed for plain error affecting the defendant's substantial rights." *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011).

## B. ANALYSIS

MRE 702 governs the admissibility of expert testimony and provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

At trial, Sadowski testified that she held an associate's degree in nursing and a nursing license, received sexual assault training through an online course, had worked at Haven since 2009, and had performed approximately 30 examinations as a sexual assault nurse examiner. Sadowski had not yet received her state certification as a sexual assault nurse examiner because she had not been available when the test was offered. She had never written any articles and never previously testified in court, although neither is required in order to qualify as an expert witness. After defendant objected to Sadowski's qualifications as an expert in forensic nursing, Sadowski further testified that the 30 examinations that she had performed were based on her forensic nursing training, she had earned approximately 36 continuing education credits, and she completed reports with each examination. The trial court qualified her as an expert in forensic nursing.

Defendant's primary argument is that the trial court abused its discretion by qualifying Sadowski as an expert because she had not yet received certification from the state. However, MRE 702 does not require that an expert be certified by the state in the area in which the expert is qualified. Rather, an expert may be qualified based on "knowledge, skill, experience, training, or education." MRE 702. Sadowski, most importantly, was a certified nurse. The fact that she

had yet to receive her SANE certification does not render her incompetent as a medical professional. To require some form of certification in a specific subfield of a larger profession in order to serve as an expert witness would cause not only absurd results, but mandate the creation of new certifications any time a novel or rare issue were before a trial court.

To the extent that defendant challenges specific portions of Sadowski's testimony on grounds other than her general lack of qualification as an expert, his claims are without merit. First, defendant challenges Sadowski's testimony that genital injury is not present in most sexual assault cases. Secondly, defendant challenges Sadowski's testimony that, during her examination of the victim, the victim was "shielding herself[,]" and "had her arms huddled around herself[.]" Defendant points out that the prosecutor referred to this testimony in her rebuttal argument. Defendant argues that Sadowski's testimony improperly enhanced the victim's credibility by indicating that, even though there was no evidence of trauma, the victim's body language implied that the sexual assaults occurred. He further argues that Sadowski's testimony was beyond her expertise, substantially prejudicial, and without foundation.

With regard to Sadowski's testimony regarding the lack of injury in most cases, this testimony was properly admitted because it was based on Sadowski's specialized knowledge and assisted the jury in understanding the evidence in this case. See MRE 702; see also *People v McLaughlin*, 258 Mich App 635, 657-658; 672 NW2d 860 (2003). The lack of the appearance of injury in sexual assault cases is not a new or novel theory. Additionally, Sadowski's testimony regarding the victim's body language was not based on Sadowski's specialized knowledge, but on her "perception of the witness." This testimony was admissible lay testimony under MRE 701, rather than as expert testimony. See *McLaughlin*, 258 Mich App at 657-658. Accordingly, the admission of Sadowski's testimony did not constitute plain error affecting defendant's substantial rights.

## IV. PRESENTENCE INVESTIGATION REPORT

Finally, defendant argues that this Court should remand this matter to the trial court because the cover sheet of his presentence investigation report (PSIR) contains inaccurate information that must be corrected. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

"A challenge to the validity of information contained in the PSIR may be raised at sentencing, in a proper motion for resentencing, or in a proper motion to remand." *People v Lloyd*, 284 Mich App 703, 705-706; 774 NW2d 347 (2009). At the sentencing hearing, defendant objected to an error on page 6 of the PSIR, but he did not object to any alleged error on the cover sheet. Defendant has not filed a motion for resentencing or a motion to remand. Therefore, this issue is unpreserved. See *id.*; *Canter*, 197 Mich App at 563. Unpreserved claims involving the accuracy of a PSIR are reviewed for plain error affecting defendant's substantial rights. *People v McCrady*, 244 Mich App 27, 32; 624 NW2d 761 (2000).

## B. ANALYSIS

"A judge is entitled to rely on the information in the presentence report, which is presumed to be accurate unless the defendant effectively challenges the accuracy of the factual

information." *People v Grant*, 455 Mich 221, 233-234; 565 NW2d 389 (1997) (citations omitted). Moreover, "[t]he Department of Corrections relies on the information contained in the PSIR to make critical decisions regarding a defendant's status. Therefore, it is imperative that the PSIR accurately reflect the sentencing judge's determination regarding the information contained in the report." *Lloyd*, 284 Mich App at 705-706 (citations omitted).

Defendant claims that the cover sheet of his PSIR improperly lists his sentences for Counts 2 and 3 as "LIFE." Defendant is correct that the trial court did not sentence him to life imprisonment on Counts 2 and 3, but rather to 10 to 40 years in prison for each count, as reflected in the amended judgment of sentence. Nonetheless, defendant has not demonstrated an error on the cover sheet of the PSIR. The PSIR is prepared before sentencing; therefore, it cannot contain information regarding the sentence imposed by the court at the sentencing hearing. See MCL 771.14. This is supported by the fact that the "Criminal History" section of the PSIR leaves blank the sentences for defendant's current offenses. Although the cover sheet refers to the "Max" sentence, it apparently lists, and informed the trial court of, the maximum sentence *possible* for each of defendant's current convictions, which was life imprisonment for Counts 1, 2, and 3. See MCL 750.520b(2). Accordingly, defendant fails to establish any plain error on the cover sheet of the PSIR.

## V. CONCLUSION

Affirmed.

/s/ Amy Ronayne Krause
/s/ Christopher M. Murray
/s/ Stephen L. Borrello