*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAMIEN DARRYL TURNER, also known as
DAMIEN DARYALLE TURNER,

        Defendant-Appellant.

UNPUBLISHED
January 7, 2021

No. 347616
Genesee Circuit Court
LC No. 16-040326-FC

Before: BOONSTRA, P.J., and GADOLA and TUKEL, JJ.

PER CURIAM.

Defendant appeals by delayed leave granted his convictions of second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to 39 to 60 years' imprisonment for the murder conviction and a consecutive two-year term of imprisonment for the felony-firearm conviction. We affirm.

## I. FACTS

This case involves two shootings that occurred on June 9, 2016, in the city of Flint. The second shooting resulted in the death of Jacquee Gardner, who died from multiple gunshot wounds. The principal issue at trial was the identification of defendant as the shooter in the shooting that resulted in Gardner's death.

Ronnie Williams, who is acquainted with defendant, testified that on June 9, 2016, at about 6:40 p.m., he saw defendant and another man near the intersection of Edwards Avenue and Mott Avenue in the City of Flint. Ronnie testified that defendant was wearing a white T-shirt, shorts, and white gym shoes. Ronnie testified that he saw defendant pull a large silver or nickel-plated gun from his pants as a third man came from around the corner shooting at defendant and his companion. Ronnie saw defendant fire the gun once or twice before defendant and his companion together ran away from the third man, who continued to fire his gun. A short time later, Ronnie learned that someone had been shot nearby. Upon seeing the victim, he recognized him as defendant's companion during the earlier shooting.

Joseph Ross lives next door to Ronnie Williams. Ross testified that on June 9, 2016, he was in his living room when he saw two men walking down the street. He then saw one of the men turn around and shoot toward the north before the two men ran off together. He described the shooter as wearing a white T-shirt, white shoes, and shorts. The shooter had a black and silver gun. Ross later went outside and picked up shell casings that he gave to police.

Shortly after the first shooting, Kemeoshaye Jackson was driving on Mott Avenue where she saw defendant and Gardner walking. She testified that she had known the two men since childhood, and that they appeared to be out of breath and were looking over their shoulders as though they were afraid. Jackson testified that the two men wanted her to give them a ride but she chose not to. A few minutes later, Jackson heard multiple gunshots.

Randie Williams, Ronnie's brother, testified that on June 9, 2016 at about 8:00 p.m., he was visiting his family on West Bundy Avenue when he saw two young men walk past the house toward Dupont Street. One of the men was wearing a white shirt and the other man was wearing a shirt with a design on it. Randie saw the man in the white shirt put something in the bushes in front of an abandoned house, then continue walking. Then, the man in the white shirt went back and retrieved an item from the bushes while the other man waited. The man in the white shirt then walked back toward the other man. When Randie heard gunshots, he got down on the floor. After the police arrived, he walked to where the victim was lying and recognized him as the man in the shirt with the design who had been the companion of the man in the white shirt. Randie told police that he thought he had heard two guns being fired.

Taylor Lawrence, who lives on West Bundy Avenue, testified that on June 9, 2016, she heard gunshots and looked out the window and saw two men standing face to face. One of the men shot the other man at close range; when the victim fell to the ground the shooter stood over the victim and continued to shoot. The shooter then ran toward Dupont Street. Taylor testified that she did not know either man and that she did not see the shooter's face. Taylor testified at trial that the shooter wore a white shirt, shorts, and white tennis shoes.

Kenneth Kellum, who knew Gardner, testified that he saw Gardner and defendant together on June 9, 2016. Although he did not know defendant's name at that time, he testified that he recognized defendant as a friend of Gardner's. Kellum testified that between 3:00 and 4:30 p.m.[1] on that day he was returning from a medical appointment and was walking on West Bundy Avenue when he saw defendant shoot Gardner. Kellum agreed that he could only see with one eye and that he did not identify defendant during a lineup.

Paula Kempher testified that she lives on Dupont Street near Bundy Avenue. On June 9, 2016, at about 8:00 p.m., she was unloading groceries when she heard gunfire. She saw one man chasing another man, then saw the first man shoot the man who was fleeing. After the victim fell, the shooter fired three more times, then walked leisurely away. Kempher called the police and described the shooter as wearing a white tee-shirt, white tennis shoes, and tan shorts, and being between 5' 7" and 6 feet tall and approximately 200 pounds, with a short afro hairstyle. She told the police that she did not see the shooter's face, that she had seen the shooter for only 10-15

---

[1] Kellum gave a much earlier time frame for the shooting than other witnesses.

seconds, and that she did not know the shooter. Kempher later identified defendant during a custodial lineup as the shooter based on "his build and his back view of like his hair and stuff like that." At the time of the lineup, she ranked her certainty about the identification as five on a range of 0-10.

Shamaria Carrington previously had been in a relationship with Gardner; she testified that she had blocked Gardner from calling her phone, but Gardner sometimes called her using defendant's phone. On June 9, 2016, at 7:48 p.m., Carrington received a call from defendant's phone but testified that it was actually Gardner who called; she learned it was Gardner when her four-year-old brother answered the phone and talked to Gardner on the phone's speaker. Carrington attempted to talk to Gardner, but only heard him say "hello" very loudly before the call was disconnected. She called both his phone and defendant's phone, but no one answered. Carrington thereafter learned of the shooting on social media; at 9:00 p.m. she called defendant who told her that he thought Gardner was with her.

Johnnie Player lives on Dupont Street near West Bundy Avenue. At about 8:00 p.m. on June 9, 2016, he was playing with his grandson outside when he heard a gunshot. About five to seven minutes later, a man walked by coming from the area of West Bundy Avenue. The man was wearing a white T-shirt, shorts, and Nike tennis shoes; the man did not appear to be in a hurry. Player's home security video recording of the man who walked by shows a man wearing clothing matching the description provided by Player.

Defendant's sister, Ciara Foster, testified that she picked defendant up near West Bundy Avenue and Dupont Street on the day of the shooting after he called and asked for a ride. Telephone records show that defendant called Foster shortly after the second shooting. Foster testified that defendant and Gardner had been "hanging out" together in June 2016. She testified that when she picked him up, defendant was wearing red shorts and a white tank top. She admitted that later when police arrived at her mother's home, she tried to remove defendant's white shoes from the house in a diaper bag. She also admitted that defendant later called her from jail and asked her to change his Facebook password and log out of his account. She denied that she did as he asked, but admitted that during the call she told defendant to "shut up" because the call was being recorded.

The medical examiner determined that Gardner died from multiple gunshot wounds. Although the guns used to shoot Gardner were not located, ballistics evidence collected at the scene of Gardner's death indicated that six cartridges found there were fired from a single firearm, consistent with a Glock firearm. Of 11 other cartridges retrieved from the scene, ten were determined to be from a gun consistent with a Smith & Wesson. Four cartridges retrieved by Ross at the location of the earlier shooting were determined to have been fired from the same gun that fired the ten cartridges found at the scene of Gardner's death. Five bullets recovered during the autopsy had markings indicating that they had been from two guns; the markings on some of the five bullets were consistent with having been fired from a Glock, while the markings on other of the five bullets were consistent with having been fired by a Smith & Wesson.

Michigan State Police Detective Sergeant Randy Khan testified as an expert in cell phone technology, telephone record analysis, and mapping of telephone calls. Khan prepared a PowerPoint presentation that was shown to the jury to illustrate various telephone calls and text

messages between defendant and others on June 9, 2016. Khan testified that the cell phone records show when an individual's phone was in use, but do not identify the person using the phone. Khan explained that tracking cell calls does not allow him to pinpoint where a phone was located. He further explained that if the closest cell tower is full, a cell phone would connect with another tower at another location.

Between 6:00 p.m. to 9:00 p.m. on June 9, 2016, there were 26 connections with cellular towers by defendant's telephone. Khan presented a visual representation of where defendant's phone connected with cell towers, including addresses related to the shootings and demonstrating where and when each call connected to a tower. Khan was able to determine which side of a tower the call used because the towers have directional antennas aimed at different geographical areas. He determined that on that evening defendant's phone was used in an area very near the crime scene, and demonstrated on the map where the location of defendant's phone coincided with that of Foster's phone at 8:00 p.m. near the crime scene. The records also showed that five calls were made from defendant's phone to Carrington's phone between 7:37 p.m. and 7:40 p.m. on the night of the shooting with no call lasting more than 24 seconds. A call was also placed from Carrington's phone to defendant's phone at 9:20 p.m. that night, lasting 75 seconds.

Danelle Pigott, a certified forensic computer and cell phone examiner with the State of Michigan, testified regarding data extracted from defendant's phone. According to Pigott, defendant's phone contained multiple Internet searches related to firearms in May and early June 2016, including searches for information on a Glock 26 with an extended magazine and an extended magazine for a Smith & Wesson firearm. Searches were also conducted with regard to the Flint Police Department Operations website, where information about dispatching officers can be found, starting shortly after the fatal shooting of Gardner until the early morning hours of June 10, 2016. Pigott testified that she was asked to review defendant's Facebook records but found that his account had been shut down.

Defendant was originally charged with open murder, MCL 750.316, felon in possession of a firearm, MCL 750.224f, felon in possession of ammunition, MCL 750.224f, carrying a concealed weapon (CCW), MCL 750.227, and felony-firearm, MCL 750.227b. At the conclusion of the trial, a jury found defendant guilty of the felon-in-possession and CCW charges, but was unable to reach a verdict on the open murder and felony-firearm charges. At the conclusion of a second trial, a jury convicted defendant of second-degree murder, MCL 750.317, and felony-firearm. Defendant now appeals his convictions of second-degree murder and felony-firearm.

## II. DISCUSSION

### A. KEMPHER'S IDENTIFICATION

Defendant contends that the trial court erred by admitting Paula Kempher's identification testimony at trial. Defendant argues that Kempher's identification of defendant at trial was based upon her identification of defendant at the preliminary examination, which was based upon her unreliable identification of defendant during a lineup. Defendant argues that admission of the identification was therefore error because there was no independent basis for the identification apart from the pretrial confrontation. We disagree.

We review for clear error a trial court's decision regarding the admission of identification evidence. *People v Blevins*, 314 Mich App 339, 348; 886 NW2d 456 (2016). Clear error occurs when the reviewing court is left with a definite and firm conviction that the trial court made a mistake. *Id*. Issues of law relevant to the admissibility of identification evidence are reviewed de novo. *People v McDade*, 301 Mich App 343, 356; 836 NW2d 266 (2013).

Identity is an element of every criminal offense. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). However, "[d]ue process protects criminal defendants against 'the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures.' " *People v Sammons*, 505 Mich 31, 41; 949 NW2d 36 (2020), quoting *Moore v Illinois*, 434 US 220, 227; 98 S Ct 458; 54 L Ed 2d 424 (1977). Identification evidence must be excluded when "(1) the identification procedure was suggestive, (2) the suggestive nature of the procedure was unnecessary, and (3) the identification was unreliable." *Id*. A pretrial identification procedure can violate a defendant's right to due process if it was "so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.) A procedure used at a lineup or photographic array is unduly suggestive where it "produces a substantial likelihood of misidentification." *McDade*, 301 Mich App at 357. The burden is on the defendant to prove that an identification procedure was impermissibly suggestive. *Kurylczyk*, 443 Mich at 302 (opinion by GRIFFIN, J.).

If a pretrial identification procedure is impermissibly suggestive, an in-court identification may still be allowed if the prosecutor can show, by clear and convincing evidence, that there was an independent basis for the identification to purge the taint caused by the earlier suggestive confrontation. *People v Kachar*, 400 Mich 78, 97; 252 NW2d 807 (1977). However, if there is no impropriety in the pretrial identification of the defendant, there is no need to establish an independent basis for an identification. *People v McElhaney*, 215 Mich App 269, 288; 545 NW2d 18 (1996). Rather, the need for an independent basis for an in-court identification only arises when the pretrial identification procedure was unduly suggestive. *People v Laidlaw*, 169 Mich App 84, 92; 425 NW2d 738 (1988).

In this case, Kempher first identified defendant as the shooter during a lineup. Thereafter, at the preliminary examination, Kempher did not identify defendant anew; rather, she identified defendant as the person whom she had picked during the lineup. At trial, Kempher again identified defendant as the same person she had identified during the lineup. Defendant objected, arguing that Kempher admitted that she had not seen the shooter's face at the time of the shooting, and that the identification therefore was not reliable. The trial court admitted the identification testimony into evidence over defendant's objection.

On appeal, defendant does not identify any improper procedure in Kempher's identification of defendant during the lineup, nor during the preliminary examination; that is, defendant has not identified anything about the custodial lineup or the preliminary examination that made those events unduly suggestive. There was therefore no need for the prosecution to establish an independent basis for the identification. See *McElhaney*, 215 Mich App at 288. Defendant argues, however, that Kempher's identification of defendant at trial was nonetheless inadmissible because it was based upon Kempher's identification of defendant during the lineup, which defendant argues was not reliable because Kempher did not see the shooter's face at the time of the shooting and

only identified defendant at the lineup based on "his build and his back view of like his hair and stuff like that," and at the time of the lineup ranked her certainty about the identification as only five on a range of 0-10.

Defendant's argument that Kempher did not see the shooter's face and was not entirely certain of her identification of defendant, however, were matters for the jury to consider in determining the weight to be given to her identification testimony. See *People v Gray*, 457 Mich 107, 122 n 18; 577 NW2d 92 (1998); see also *Sammons*, 505 Mich at 76 n 38 (ZAHRA, J., dissenting), citing *People v Causey*, 834 F 2d 1277, 1285 (1987) (The specificity of a witness's description of a suspect, the amount of time the witness saw the suspect, and other shortcomings of a witness's identification pertain to the weight of the identification evidence rather than its reliability, and thus are questions for the jury.)

Moreover, we observe that Kempher's identification of defendant was not the only identification evidence linking defendant to the shooting. There was ample, indeed strong, evidence from which a jury could conclude that defendant was the person who shot Gardner. Defendant and Gardner were observed together participating in a shooting earlier that same evening at a location not far from where Gardner himself was later shot. The first shooting was observed by Ronnie Williams, who knew defendant and identified him as one of the shooters in that incident. Shortly after that shooting, defendant and Gardner were seen together by Kemeoshaye Jackson, a witness who knew both men, not far from where the first shooting occurred. They asked her for a ride, and appeared to be out of breath and afraid.

An hour and a half later, Gardner was observed walking together with a man meeting defendant's description and dressed in the same clothes defendant had been seen in earlier. Randie Williams and Taylor Lawrence each testified that they saw a man meeting defendant's description shoot Gardner. Kenneth Kellum, who knew defendant and Gardner, testified that he saw defendant shoot Gardner. In addition, Shamaria Carrington testified that minutes before his death, Gardner used defendant's cell phone to call her, and cell phone mapping evidence indicated that the cell phones of both men were in the same area during both shootings. The bullets recovered during Gardner's autopsy were consistent with two guns that appeared in a photograph recovered from defendant's phone. Some of the shell casings discovered at the scene of Gardner's death were fired from the same gun as the shell casings Ross discovered at the scene of the first shooting. Thus, although we find no error in the admission of Kempher's identification testimony, we observe that any error in its admission would have been harmless in light of the ample evidence that identified defendant as the person who shot Gardner. See *Sammons*, 505 Mich at 56, 58; *Blevins*, 314 Mich App at 349 ("Erroneously admitted identification testimony warrants reversal only when the error is not harmless beyond a reasonable doubt.")

In summary, defendant does not contend that the lineup at which Kempher identified defendant was unduly suggestive, nor that the identification procedure at the preliminary examination was unduly suggestive. Rather, defendant asserts that Kempher's identification of him was unreliable because she did not see the shooter's face and was not certain about her identification of defendant. This is a challenge to the weight of the evidence, not to its admissibility. Moreover, the record contains ample evidence from which the jury could have concluded that defendant's identity as the shooter had been established. Accordingly, the trial

court did not err by admitting Kempher's identification testimony at trial, and reversal would not be warranted in any event.

## B. UNAVAILABLE WITNESS

Defendant also contends that the trial court erred by ruling that Kenneth Kellum was unavailable for trial and allowing the prosecutor to introduce Kellum's earlier testimony under MRE 804(b)(1). Defendant argues that Kellum was not demonstrated to be unavailable because the prosecution failed to exercise due diligence to locate and produce Kellum for trial. We disagree.

A trial court's decision regarding whether due diligence to produce a witness has been shown will not be disturbed on appeal absent a clear abuse of discretion. *People v Bean,* 457 Mich 677, 684; 580 NW2d 390 (1998). Likewise, a trial court's evidentiary decisions generally are reviewed for an abuse of discretion, which occurs when its decision falls outside the range of reasonable and principled outcomes. *People v Thorpe*, 504 Mich 230, 251-252; 934 NW2d 693 (2019).

MRE 804(a)(5) provides that a witness is unavailable if the witness "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown." Our Supreme Court has explained:

> The test for whether a witness is "unavailable" as envisioned by MRE 804(a)(5) is that the prosecution must have made a diligent good-faith effort in its attempt to locate a witness for trial. The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it. [*Bean*, 457 Mich at 684 (citations omitted).]

In this case, Kellum appeared and testified at defendant's first trial. He was again served with a subpoena to testify at defendant's second trial and told the officer in charge that he intended to appear. When Kellum failed to appear on the first day of trial, the officer in charge contacted Kellum by telephone, and Kellum assured the officer that he would appear the next day. When Kellum again failed to appear, efforts were made over the course of the next week to locate Kellum, but were unsuccessful. Kellum did not have any known residence, but officers contacted relatives and people who knew him, went to places where he worked or had lived, and even conducted surveillance of his place of employment and places he was known to frequent. After it was learned that Kellum had a medical condition that required treatment, the trial court directed the police to contact Kellum's doctor and check area hospitals, but these efforts also were unsuccessful. Kellum's girlfriend then informed the officer that Kellum had left town and was refusing to appear because he had been threatened by defendant's father. These facts support the trial court's determination that diligent efforts were made to locate and produce Kellum for trial.

Defendant also argues that there was no support for the officer's testimony regarding threats made against Kellum. However, the focus of the hearing was on the prosecution's efforts to locate Kellum, and the test for due diligence "is one of reasonableness and depends on the facts

and circumstances of each case." *Bean*, 457 Mich at 684. Therefore, any information that the officer received from others regarding Kellum's possible location, including any motive for evading the police, was relevant in considering the reasonableness of the officer's investigative efforts. There also is no support for defendant's argument that the prosecution knew that Kellum did not intend to testify. Kellum testified at defendant's first trial, and when he was served with a subpoena for the second trial, he assured the officer that he would again testify. It was only after Kellum failed to appear that the officer learned that Kellum did not intend to cooperate. Efforts were made to locate him over the course of the next week, but were unsuccessful. We therefore conclude that the trial court did not err by declaring Kellum unavailable under MRE 804(a)(5), and permitting the introduction of his earlier testimony.

## C. OTHER CHALLENGED EVIDENCE

Defendant also challenges the admission of certain evidence that defendant argues was irrelevant, misleading, or unfairly prejudicial. We note initially that to preserve a challenge to the admission of evidence, defense counsel was required to object at trial to the admission of the evidence and to assert the same ground for objection that defendant now asserts on appeal. MRE 103(a)(1); *Thorpe*, 504 Mich at 252. In this case, defendant objected only to some of the evidence that he now challenges on appeal. We review the trial court's decision on preserved evidentiary challenges for an abuse of discretion. *Id*. at 251-252. Ordinarily, the trial court's decision on a close evidentiary question is not an abuse of discretion. *Id*. at 252. When a decision regarding the admission of evidence involves a preliminary question of law, such as whether a rule of evidence permits admission of the evidence, that question is one of law that this Court reviews de novo. *McDade*, 301 Mich App at 356.

In addition, preserved nonconstitutional errors are subject to a harmless-error review under MCL 769.26. *Thorpe*, 504 Mich at 252. MCL 769.26 provides:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

Preserved nonconstitutional errors are presumed not to be grounds for reversal unless it affirmatively appears that more probably than not, the error was outcome determinative, meaning that it undermined the reliability of the verdict. *People v Douglas*, 496 Mich 557, 566; 852 NW2d 587 (2014).

We review defendant's unpreserved evidentiary challenges for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). If an error is unpreserved, whether the error is constitutional or nonconstitutional, the defendant must show that there has been a plain error affecting his or her substantial rights, and "the reviewing court should reverse only when the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Thorpe*, 504 Mich at 252-253.

Generally, relevant evidence is admissible at trial. MRE 402; *People v Bergman*, 312 Mich App 471, 483; 879 NW2d 278 (2015). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Relevant evidence may warrant exclusion, however, if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. "[E]vidence is unfairly prejudicial when there exists a danger that marginally probative evidence might be given undue weight by the jury." *People v Dixon-Bey*, 321 Mich App 490, 513; 909 NW2d 458 (2017). When reviewing a trial court's decision for an abuse of discretion, this Court views the evidence in the light most favorable to its proponent, giving the evidence "its maximum reasonable probative force and its minimum reasonable prejudicial value." *People v Head*, 323 Mich App 526, 540; 917 NW2d 752 (2018); see also *People v Sharpe*, 502 Mich 313, 333; 918 NW2d 504 (2018) ("All relevant and material evidence is prejudicial; we are concerned only with unfairly prejudicial evidence that may be given inappropriate weight by the jury or involve extraneous considerations").

## 1. 911 CALL RECORDS

Defendant challenges the admission of an "event chronology" of various 911 calls that were made on the evening of the shooting. According to the testimony of the 911 supervisor, the document contained information for the various calls, such as the date, time, and location of each call. At trial, defendant challenged the admission of this exhibit under the best evidence rule, and the trial court admitted the exhibit over defendant's objection. Defendant asserts on appeal that this exhibit contained irrelevant information. Defendant, however, does not identify any particular information in the document as irrelevant, nor does he explain why it lacks relevance. The exhibit was a document that listed factual information about the time, duration, and location of various 911 calls related to the shootings, which was relevant to establish a timeline for the shootings. Defendant has not established that the trial court abused its discretion by admitting this evidence. See *People v Bosca*, 310 Mich App 1, 33; 871 NW2d 307 (2015) (A party may not merely announce a position without providing reasoning and citation to relevant authority).

## 2. PHOTOGRAPHS OF THE VIEW FROM KEMPHER'S HOME

Kempher testified that she observed the shooting as she was entering her house and standing on a ramp leading into the house. During trial, the prosecutor introduced photographs taken from the ramp to demonstrate Kempher's view of the shooting. Defendant objected to the photographs because they were taken in the fall when leaves were no longer on the trees, and thus did not depict how the area would have appeared in June when the shooting occurred. The trial court overruled the objection. On appeal, defendant argues that the photos were misleading because the change of seasons meant that the amount of foliage shown in the photos did not accurately depict Kempher's view on the night of the shooting.

Photographs are admissible if they are relevant, and warrant exclusion only when their probative value is outweighed by the danger of unfair prejudice. *People v Brown*, 326 Mich App 185, 192; 926 NW2d 879 (2018). When evidence is offered as an aid to illustrate testimony regarding an event, an exact replication of the circumstances of the event is not required. *People*

*v Bulmer*, 256 Mich App 33, 35; 662 NW2d 117 (2003). In this case, the photos were offered for the limited purpose of showing Kempher's vantage point from the area of her home where she claimed to have viewed the shooting, and were relevant for that purpose. Kempher testified that the photos accurately reflected her vantage point of the shooting scene from where she was standing at her house. The jury was aware that there were differences in the conditions of the foliage depicted in the photos because the photographs were taken at a different time of the year. Defendant has not demonstrated that he was unfairly prejudiced by the admission of the photographs, and thus has not shown that the trial court abused its discretion by admitting the photos.

### 3. OTHER PHOTOGRAPHIC EVIDENCE

Defendant provides a summary of other evidence, mostly photographs, that he claims was improperly introduced at trial. Defendant argues that any relevance of the photos was outweighed by their prejudicial effect. We disagree.

As noted, photographs are admissible if they are relevant, and warrant exclusion only when the probative value of the evidence is outweighed by the danger of unfair prejudice. *Brown*, 326 Mich App at 192. Photographs may be used to corroborate the testimony of a witness. *Id*. Photographs that are otherwise admissible for a proper purpose are not rendered inadmissible merely because they portray the details of a gruesome crime. *Id*. at 193.

Defendant contends that the trial court improperly admitted the photographs of the victim's body, including closeup views of his injuries, which defendant argues were not relevant because he did not dispute the manner of Gardner's death. Because defendant was charged with open murder, however, intent was an issue for the jury to resolve; the number and location of the deceased's wounds were probative of the shooter's intent. In addition, the photographs were relevant to show whether the descriptions of the shooting by the eyewitnesses were consistent with the victim's injuries.

Defendant also challenges as prejudicial photographs of two guns discovered on defendant's cell phone. Testimony established that the guns depicted in the photographs were consistent with the shell casings recovered from the shooting scenes and bullets retrieved during the autopsy. The photographs were therefore relevant to show defendant's interest in and potential access to firearms similar to the type of weapons that were used in the shootings. Accordingly, the trial court did not abuse its discretion by admitting the photos.

Also introduced into evidence was a photograph from Gardner's phone taken two days before his death showing Gardner with a firearm in his hand that was consistent with the type of firearm used to shoot him. Defendant does not clearly explain his challenge to the admission of this photograph. He objected to the photo at trial on the basis of foundation, which was later supplied by an officer who identified the person in the photo as Gardner. Similarly, defendant contends that photographs depicting the geography of the areas surrounding the shooting locations were not properly admitted, but does not explain or support his challenge to this evidence. Accordingly, defendant has not established that the trial court abused its discretion by admitting the photos. See *Bosca*, 310 Mich App at 33.

## 4. CELL PHONE MAPPING EVIDENCE

Defendant also contends that the trial court erred by admitting an exhibit used at trial to illustrate cell phone activity. At trial, Detective Khan testified extensively regarding a Power Point document, which was admitted without objection to show cell tower locations to which defendant's phone connected on the day in question. Defendant argues that the exhibit was inadmissible because it "provided a visual representation of unreliable evidence," given that testimony at trial established that cell phone mapping could not identify the specific location where a cell phone was used. Contrary to defendant's suggestion, Detective Khan did not testify that the document showed the exact location where the cell phones were used. At trial, defense counsel explored at length the different factors that could cause a phone to connect to one or more towers and the detective's testimony was clear that the mapping process showed only a general geographic area where a phone was used, and not an exact location. Accordingly, the trial court did not plainly err by admitting the cell phone mapping evidence.

## 5. IMPEACHMENT OF KEMEOSHAYE JACKSON

Defendant contends that the prosecutor improperly questioned Kemeoshaye Jackson about a prior criminal matter in which the victim, Gardner, was charged with committing various crimes against defendant. Gardner previously had been charged with armed robbery and assault with intent to commit murder with regard to defendant. Gardner ultimately pleaded guilty to carrying a concealed weapon and aiming a firearm without malice. The purpose of the questioning was to impeach Jackson's testimony that defendant and Gardner were friends.

On appeal, defendant argues that it was improper to question Jackson regarding the original charges against Gardner that did not result in convictions and cites authority to support the argument that evidence of a *witness's* prior arrests or charges not resulting in a conviction for the purpose of impeaching that witness's general credibility are inadmissible. See *People v Falkner*, 389 Mich 682; 209 NW2d 193 (1973), limited by *People v Layher*, 464 Mich 756; 631 NW2d 281 (201). Here, the prosecution did not introduce evidence of prior arrests or charges involving Jackson to impeach Jackson's credibility; rather, the prosecution used evidence of criminal charges against Gardner for assaulting defendant to rebut Jackson's testimony that defendant and Gardner were friends. Defendant's argument is therefore misplaced. Given Jackson's testimony that defendant and Gardner were friends, and the relevance of the challenged evidence to that issue, defendant has not shown that the prosecutor's examination was improper.

## 6. DEFENDANT'S JAIL CALL TO FOSTER

Defendant also challenges the admission of evidence of a recorded telephone call between him and his sister, Ciara Foster, during which defendant asked Foster to change the password for his Facebook account and to log out of that account. Because the recording of the call was difficult to hear, the prosecutor had a court reporter prepare a transcript of the call, which the prosecutor offered into evidence. After conducting a separate hearing, the trial court admitted both the recorded call and the prepared transcript of that call. Defendant argues that neither the recording nor the transcript should have been admitted because the recording was too "garbled," and the transcript was the court reporter's interpretation of the audio recording.

A trial court has discretion with regard to the admission of recordings and transcripts of recordings. "Before submitting a transcript of an audio recording to the jury, the trial court should take steps to ensure its accuracy." *City of Westland v Kodlowski*, 298 Mich App 647, 665; 828 NW2d 67 (2012), vacated in part on other grounds 495 Mich 871 (2013). In *Kodlowski*, this Court, citing *People v Lester*, 172 Mich App 769, 775-776; 432 NW2d 433 (1988), explained:

> The preferred procedure is to have the parties stipulate to the transcript's accuracy. *Id*. at 775. Absent a stipulation, the trial court may verify the transcript's accuracy by relying on the verification of the transcriber or by conducting an independent determination by comparing the transcript with that of the audio recording. *Id*. at 776. These procedures are not exhaustive, as the aim is to utilize procedures that ensure the reliability of the transcript. *Id*. at 775. Thus, under certain situations the trial court may find that the best course of action is to allow the jury to determine the contents of the audio recording itself and decline to admit a prepared transcript. [*Kodlowski*, 298 Mich App at 665-666.]

In this case, the trial court conducted a separate hearing during which it both listened to the audio recording and took testimony from the court reporter who prepared the transcript to determine the accuracy of the transcript. The court reporter testified that she listened to the recording several times and typed exactly what she heard, and then proofed the final transcript. The court reporter agreed that there were portions of the recording that were difficult to understand, but said she indicated this in the transcript when that occurred. This testimony supports a finding that the transcript accurately reflected the substance of the recording. Furthermore, the trial court admitted both the recording and the transcript, which enabled the jury to listen to the recording and determine for itself whether the transcript accurately represented the content of the recording. Under these circumstances, there is no basis to conclude that the trial court abused its discretion by admitting this evidence.

## D. SUPPLEMENTAL JURY INSTRUCTION

Defendant also contends that the trial court erred by giving a supplemental instruction to the jury when the jury indicated that it was unable to reach a verdict. Defendant argues that the supplemental instruction coerced the jury into reaching a verdict, and that defense counsel at trial was ineffective for failing to object to the supplemental instruction. We disagree. At trial, defendant did not object to the supplemental jury instruction. As a result, this issue is unpreserved, and our review is limited to plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764.

The jury in this case was released to begin deliberations at 9:08 a.m. At 2:54 p.m. that day, the trial court announced that it had received a note from the jury stating that it could not agree on a verdict. Without objection, the trial court gave the following supplemental instruction to the jury:

> All right, please be seated. The record will show on People versus Turner, that we have both counsel and Defendant. The Court asked the jury to come in the courtroom because I had a note that says in two words "Hung jury." What that may

mean to you and what means—it means to us may be different, but in any event I take it that to mean you are having difficulty arriving at a verdict.

I'm going to ask you to please return to the jury room and resume your deliberations in the hope that, after further discussions, you will be able to reach a verdict. As you deliberate, please keep in mind the guidelines I gave you earlier; and I will say it's way too early on a case of this length and this magnitude to, shall we say, give up the ghost.

Remember first it is your duty to consult with your fellow jurors and try to reach an agreement if you can do so without violating your own judgment. To return a verdict, you must all agree and the verdict must represent the judgment of each one of you. As you deliberate, you should carefully and seriously consider the views of your fellow jurors. Talk things over in a spirit of fairness and frankness. Naturally, there will be differences of opinion. You should not only express your opinion, but also give the facts and the reasons upon which you base it. By reasoning the matter out, jurors are almost always able to reach an agreement.

If you think it would be helpful, you may submit to us a written list of any issues that are dividing or confusing you; and it will then be submitted to me and, in consultation with Mr. Fehrman and Mr. Piazza, I will attempt to clarify or amplify the instructions in order to assist you in your further deliberations. We would also be willing to offer you any additional exhibits that have been introduced that are sitting here in the courtroom.

When you continue your deliberations, do not hesitate to rethink your own views and change your opinion if you decide it was wrong; however, as I stated before, none of you should give up your honest beliefs about the weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching a verdict.

The jury resumed deliberations at 3:01 p.m., and reached a verdict at approximately 4:30 p.m.

When a jury indicates it cannot reach a unanimous verdict, a trial court may give a supplemental instruction to encourage the jury to continue deliberating. *People v Walker*, 504 Mich 267, 276; 934 NW2d 727 (2019). The goal of giving the supplemental instruction is to encourage the jury to deliberate further without coercing a verdict. *Id*. The model instruction, M Crim JI 3.12, is an example of an instruction that strikes the proper balance, but is not the only instruction that properly may be given. *Id*. at 277-278. "The relevant question is whether the instruction given [could] cause a juror to abandon his [or her] conscientious dissent and defer to the majority solely for the sake of reaching agreement." *Id*. at 278 (quotation marks and citation omitted).

M Crim JI 3.12 provides:

(1) You have returned from deliberations, indicating that you believe you cannot reach a verdict. I am going to ask you to please return to the jury room and resume your deliberations in the hope that after further discussion you will be able

-13-

to reach a verdict. As you deliberate, please keep in mind the guidelines I gave you earlier.

(2) Remember, it is your duty to consult with your fellow jurors and try to reach agreement, if you can do so without violating your own judgment. To return a verdict, you must all agree, and the verdict must represent the judgment of each of you.

(3) As you deliberate, you should carefully and seriously consider the views of your fellow jurors. Talk things over in a spirit of fairness and frankness.

(4) Naturally, there will be differences of opinion. You should each not only express your opinion but also give the facts and the reasons on which you base it. By reasoning the matter out, jurors can often reach agreement.

(5) If you think it would be helpful, you may submit to the bailiff a written list of the issues that are dividing or confusing you. It will then be submitted to me. I will attempt to clarify or amplify the instructions in order to assist you in your further deliberations.

(6) When you continue your deliberations, do not hesitate to rethink your own views and change your opinion if you decide it was wrong.

(7) However, none of you should give up your honest beliefs about the weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching agreement.

Defendant argues that the trial court coerced the jury into returning a verdict by remarking that it was too early for the jury to give up deliberating and by remarking that jurors are almost always able to reach an agreement. Although that comment is not part of the standard jury instruction, it was not inherently coercive. The remark was a comment on the length and magnitude of the case; it was not calculated to cause a juror to abandon his or her conscientious dissent or to persuade a juror to defer to the majority solely for the sake of reaching agreement. The court's comment that "[b]y reasoning the matter out, jurors are almost always able to reach an agreement" represents a minor deviation from the standard jury instruction, M Crim JI 3.12(4), that "[b]y reasoning the matter out, jurors can often reach agreement." The court's replacement of "can often" with "almost always" was not so significant that it would cause a juror to feel coerced into returning a verdict. Moreover, at the end of the supplemental instruction the court reminded the jurors that they should not give up their individual beliefs for the sake of reaching a verdict.

We therefore reject defendant's argument that the instruction was improper. Accordingly, defense counsel was not ineffective for failing to object to the supplemental instruction because defense counsel had no obligation to raise a meritless objection. *People v Chelmicki,* 305 Mich App 58, 69; 850 NW2d 612 (2014).

Affirmed.

/s/ Mark T. Boonstra
/s/ Michael F. Gadola
/s/ Jonathan Tukel