*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 25, 2024

Plaintiff-Appellee,

v

No. 364313
Wayne Circuit Court
LC No. 18-005279-01-FC

BERNARD PETERSON,

Defendant-Appellant.

Before: JANSEN, P.J., and REDFORD and D. H. SAWYER*, JJ.

PER CURIAM.

In August 2019, a jury convicted defendant of one count of first-degree criminal sexual conduct (CSC-I), MCL 750.520b (multiple variables), and two counts of kidnapping, MCL 750.349. The trial court sentenced defendant, as a fourth-offense habitual offender, MCL 769.12, to three concurrent terms of life in prison for the kidnapping and CSC-I convictions. Defendant appeals by leave granted[1] the trial court's order denying his motion for new trial. On appeal, defendant argues that he is entitled to a new trial because he was denied his rights under the Confrontation Clause, US Const, Am VI; Const 1963, art 1, § 20; the court improperly admitted other-acts evidence; he was entitled to a special unanimity jury instruction; and, in several respects related to the foregoing issues, he was denied the effective assistance of counsel. We vacate Part II. A. of the trial court order only, regarding defendant's argument that the absence of testimony from the laboratory scientists who tested the DNA samples and prepared the DNA profiles denied him the right to confrontation, and that trial counsel was ineffective for failure to object on these grounds, and we remand to the trial court to determine whether this evidence constitutes testimonial evidence and whether defendant was denied his confrontational rights. In all other regards, we affirm.

---

[1] *People v Peterson*, unpublished order of the Court of Appeals, entered May 18, 2023 (Docket No. 364313).

*Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

-1-

## I. GENERAL BACKGROUND

Defendant's convictions arose from events that occurred in early July 1989. According to their trial testimony, sometime between midnight and 2:00 a.m. on July 5, 1989, complainants, BC and KS, traveled from Clinton Township to Detroit to buy marijuana. BC was 17 years old; KS was 19 or 20. They stopped at a house that KS believed to be the place where they could purchase marijuana. KS went up to the door, knocked, and when nobody answered, she returned to BC's car. At that point, a man jumped into the back seat of the car, put a gun to BC's head, and instructed her to drive to an abandoned house a few blocks away. The man ordered the two women into the abandoned house, he struck both women in the face and head with his gun, took their jewelry and a small sum of cash, and then sexually assaulted BC by inserting his penis into her vagina. After the assault, the man fled the scene and BC and KS were able to leave.

They went to the hospital, and a registered nurse collected bodily fluid samples from BC and placed the swabs, among other things, in a sexual assault kit. The kit was eventually turned over to the Detroit Police Department. In November 2017, BC's kit was sent to the Michigan State Police (MSP) Forensic Science Division and then forwarded, under a federal grant, to Sorenson Forensics (Sorenson) to be tested. Testing identified a DNA profile of an unknown male. This information was forwarded to the MSP Forensic Science Division to be reviewed and entered into a DNA database. On February 1, 2018, a case-to-case association was found between defendant's DNA profile and the DNA profile found in BC's sexual assault kit. Later, a buccal swab from defendant was compared with the DNA profile from BC's sexual assault kit and the match was confirmed.

In May 2018, defendant was charged with one count of CSC-I and two counts of kidnapping. The prosecution filed a notice of intent to introduce other-acts evidence under MRE 404(b). Specifically, the prosecution sought to introduce evidence linking defendant to the sexual assaults of, at least, seven other women occurring primarily between 1997 and 1999. Ultimately, other-acts evidence related to only one other victim, TW, would be offered and admitted at trial.

A four-day jury trial was held in August 2019, after which the jury reached its verdict of guilty as charged. The trial court sentenced defendant, as a fourth-offense habitual offender, to three concurrent terms of life in prison for the kidnapping and CSC-I convictions.

Defended moved for a new trial and evidentiary hearing. Defendant raised five issues: (1) that the absence of testimony from the laboratory scientists who tested the DNA samples and prepared the DNA profiles denied him the right to confrontation, (2) that trial counsel was ineffective when he agreed to permit the prosecution to call multiple witnesses using video technology, (3) that trial counsel was ineffective for failing to provide any rationale for his objection to the admission of evidence of another sexual assault, (4) that trial counsel was ineffective for failing to move to suppress the DNA testing of samples from the kits where the prosecutor failed to authenticate the samples and provide a full chain of custody, and (5) that the trial court erred by neglecting to instruct the jury that it must unanimously agree on which

aggravating circumstance supported the CSC-I charge. The court granted defendant's motion for a *Ginther*[2] hearing, which was held over two days in April 2022.

The court subsequently denied defendant's motion for a new trial. The court found that defendant failed to establish that his trial counsel was ineffective for failing to object to the absence of any testimony from the lab scientists who personally tested the samples and prepared the DNA profiles from the sexual assault kits. The court found that the data generated was not testimonial in nature and, therefore, the Confrontation Clause did not require the testimony of each individual lab technician. Moreover, the court concluded that trial counsel was not ineffective for objecting based on MRE 703 rather than Confrontation Clause grounds. The court also found that trial counsel was not ineffective when he agreed to allow the prosecution to call multiple witnesses to testify by two-way video technology. The court noted that a number of witnesses were out of state or in other parts of Michigan. The court noted that it used the court's polycom system that allowed the judge, jury, and defendant to observe each witness in real time. The testimony was given under oath and the parties had the opportunity to fully cross-examine the witnesses. Consequently, the court ruled that the failure to object to the use of two-way video testimony was not outcome-determinative. The court found that trial counsel was not ineffective for failing to provide a rationale for his objection to the admission of 404(b) evidence. The court held that the evidence was admissible because the prosecution offered the evidence to prove something other than propensity and the probative value was not substantially outweighed by the danger of undue prejudice. The court noted that a limiting instruction was given to the jury. Next, the court found no merit to defendant's argument that trial counsel was ineffective for failing to move to suppress the DNA testing sample from the kits on grounds that the prosecutor failed to authenticate the samples and failed to provide sufficient chain of custody evidence. Lastly, the court rejected defendant's claim that a special unanimity instruction was required and that trial counsel was ineffective when he did not request such an instruction.

Defendant applied for leave to appeal the trial court's order denying defendant's postjudgment motion for a new trial. In addition, defendant moved to remand for a *Ginther* hearing. This Court granted the application for leave to appeal, however, it denied defendant's motion to remand.[3]

## II. ANALYSIS

### A. CONFRONTATION CLAUSE

Defendant asserts that the admission of DNA profile evidence that came through the testimony of various trial witnesses called by the prosecution violated his rights under the Confrontation Clause. He argues he was denied the right to confront the individuals, presumably from Sorenson, that actually did the testing and prepared the DNA profiles. To preserve a

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] *People v Peterson*, unpublished order of the Court of Appeals, entered May 18, 2023 (Docket No. 364313).

constitutional claim, a defendant must "raise an objection on the ground" also raised on appeal. *People v Brown*, 326 Mich App 185, 191-192; 926 NW2d 879 (2019). Defendant objected to the testimony of all of the witnesses deemed experts in the area of DNA analysis; however, he did not object on Confrontation Clause grounds. Instead, defendant objected to the testimony under MRE 703;[4] specifically, defendant argued that the opinions of the witnesses were not admissible because the facts or data upon which they based their opinions were not in evidence. While defendant objected to the admission of the evidence, he did so on grounds different than those asserted on appeal. Accordingly, defendant's constitutional claim has not been properly preserved for appellate review.

Because defendant's Confrontation Clause argument is unpreserved, this Court's review is limited to plain error affecting defendant's substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id.* at 763. To show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764 (quotation marks and citation omitted).

Both the United States and the Michigan Constitutions guarantee a criminal defendant the right "to be confronted with the witnesses against him." *People v Nunley*, 491 Mich 686, 697; 821 NW2d 642 (2012); see also US Const, Am VI; Const 1963, art 1, § 20. In particular, the Confrontation Clause protects against "hearsay evidence that is 'testimonial' in nature." *Nunley*, 491 Mich at 697-698, quoting *Crawford v Washington,* 541 US 36, 51; 124 S Ct 1345; 158 L Ed 2d 177 (2004). Because the introduction of out-of-court testimonial statements violates the Confrontation Clause, statements of this nature are inadmissible unless the declarant appears at trial or the defendant has had a previous opportunity to cross-examine the declarant. *Nunley*, 491 Mich at 698.

The United States Supreme Court recently held that this prohibition "applies in full to forensic evidence. So a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing." *Smith v Arizona*, 602 US ___, ___; 144 S Ct 1785; ___ L Ed 2d ___ (2024); slip op at 1. Specifically, "[w]hen an expert conveys an absent analyst's statements in support of his opinion, and the statements provide that support only if true, then the statements come into evidence for their truth." *Id*. at ___; slip op at 2. In *Smith*,

---

[4] At the time of trial, MRE 703 provided: "The facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence. This rule does not restrict the discretion of the court to receive expert opinion testimony subject to the condition that the factual bases of the opinion be admitted in evidence hereafter." The Michigan Rules of Evidence, including MRE 703, were substantially amended, effective January 1, 2024. See 512 Mich lxiii (2023). The previous version of the evidentiary rules in effect at the time of trial will be relied on throughout this opinion.

the petitioner was found by police among what appeared to be large quantities of drugs. *Id*. at ___; slip op at 8. The seized items were sent to a crime lab, were tested by an analyst, Elizabeth Rast, and she concluded in a written report that the materials contained methamphetamine, marijuana, and cannabis. *Id*. at ___; slip op at 8-9. The state planned for Rast to testify at trial, but she stopped working at the lab, so the state had a different forensic scientist, Greggory Longoni, testify in her place. *Id*. at ___; slip op at 9. Longoni testified that the materials tested were large quantities of the above-identified drugs, basing his opinion on Rast's records. *Id*. at ___; slip op at 9.

Smith argued that the admission of Longoni's testimony violated his rights under the Confrontation Clause, and the Supreme Court concluded that this claim could only succeed if Rast's statements came into evidence for their truth. *Id*. at ___; slip op at 11. Because the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted, courts analyzing claims under the Confrontation Clause must identify the role an out-of-court statement served at trial. *Id*. at ___; slip op at 11. The Supreme Court considered whether Rast's statements about her lab work were introduced for their truth, and concluded that they were. *Id*. at ___; slip op at 11-14. "If an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts." *Id*. at ___; slip op at 14.

However, the analysis does not end here. If an out-of-court statement is offered for the truth of the matter asserted, it must also be testimonial to be in violation of the Confrontation Clause. *Id*. at ___; slip op at 19. In *Smith*, the question whether Rast's out-of-court statements conveyed by Longoni were testimonial was not presented by the petition for certiorari; petitioner "took as a given that they were." *Id*. at ___; slip op at 19. Therefore, the Supreme Court remanded the case to the Arizona Court of Appeals to decide the testimonial issue in the first instance. *Id*. at ___; slip op at 20.

In this case, BC could not identify defendant as the man who sexually assaulted her. However, the prosecution presented several witnesses, all qualified as experts in DNA analysis, whose cumulative testimony established that defendant's DNA profile matched the DNA profile found in the fluids that were collected and preserved in BC's sexual assault kit. Shelby Glover, a DNA analyst employed by Sorenson, explained the process that is employed to obtain a DNA result. She testified that her primary role in this case was to analyze the DNA data that had been generated, interpret the results, and prepare a written report. After Glover reviewed the data generated for the case, she concluded that two DNA contributors were present in vaginal swabs taken from the complainant. According to Glover, one of the contributors matched BC's DNA, and the other DNA was from an unknown male. On cross-examination, Glover admitted that she reviewed and relied on data received from other lab technicians.

Elizabeth Lyons, a scientist employed by the MSP in its DNA databasing unit, testified that she found an "association" between the male DNA found in the sexual assault kit and defendant's DNA profile. Because of this preliminary association, Smith requested a new oral swab from defendant. Then, Kirk Deleeuw, a forensic scientist employed by the MSP, testified that when Sorenson completed its analysis, the data was sent to the MSP for review. Deleeuw reviewed the data that was produced by Sorenson and reviewed and agreed with the results Sorenson made. He further testified that the unknown male profile identified in the vaginal swab was entered into a

database to search against various other cases. This process, according to Deleeuw, was used as an investigative tool when the MSP did not have a suspect to initially compare to a profile. In this case, an association was found. After this association was revealed, Deleeuw requested and received a current reference sample from defendant to be compared to the evidence in the case. Deleeuw compared the known buccal swab from defendant with the unknown male DNA profile, and found that defendant's DNA matched the DNA profile that was obtained from BC's vaginal swab.

Similar testimony was elicited from Sorenson scientist Matthew Pettis and MSP analysts, Amber Smith, Jennifer Jones, and Lyons, to establish that defendant's DNA profile matched the unknown male DNA profile found in TW's sexual assault kit—the other-acts evidence. Smith testified that outsourcing labs such as Sorenson developed data on sexual assault kits and that this data was then forwarded to the MSP where analysts reviewed the data. Further, Smith testified that she reviewed the Sorenson data and drew her own conclusions on how she would interpret the evidence. Similarly, Jones testified that she interpreted the DNA profiles generated by the outsourced lab. She then made comparisons to the reference sample submitted from the known buccal swab from defendant. Jones then concluded that defendant's DNA profile was consistent with the DNA profile found on the condom in TW's sexual assault kit. Of particular note, Jones was the actual analyst that generated the DNA profile from defendant. Pettis, a former Sorenson employee, testified, relative to the TW case, that his responsibilities included interpreting and reviewing data that was produced during testing, forming a conclusion, and then preparing a report.

Applying the holding provided in *Smith*, the prosecution

> may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her. Neither may the State introduce those statements through a surrogate analyst who did not participate in their creation. And nothing changes if the surrogate—as in this case—presents the out-of-court statements as the basis for his expert opinion. Those statements [] come into evidence for their truth—because only if true can they provide a reason to credit the substitute expert. So a defendant has the right to cross-examine the person who made them. [*Smith*, 602 US at ___; slip op at 21-22 (citations omitted).]

As such, the prosecution did not "escape the Confrontation Clause" just because the raw DNA data from Sorenson came in to explain the basis of several expert witnesses' opinions. *Id*. at ___; slip op at 22.

However, the next step in the analysis is whether the out-of-court statements conveyed by the testifying witnesses were testimonial. In *Smith*, the Supreme Court did not address this question because it was not presented in the petition for certiorari; rather, it was assumed that the subject statements were testimonial. *Id*. at ___; slip op at 19. This was based on the Arizona Court of Appeals' opinion relying on the " 'not for the truth' " rationale rejected by the Supreme Court. *Id*. at ___; slip op at 19-20. Where the lower court did not decide the issue, and it was unclear whether the issue was forfeited, the Supreme Court remanded to the appeals court to make the initial determination with the following guidance:

First, the court will need to consider exactly which of Rast's statements are at issue. In this Court, the parties disputed whether Longoni was reciting from Rast's notes alone, or from both her notes and final report. In Arizona's view, everything Longoni testified to came from Rast's notes; although he at times used the word "report," a close comparison of the documents and his testimony reveals (the State says) that he meant only the notes. Smith disagrees, taking Longoni's references to the "report," as well as the notes, at face value. According to Smith, Longoni "relied on both" documents and in fact "treated them as a unit," with the notes "attached" to the report as "essentially an appendix." Resolving that dispute might, or then again might not, affect the court's ultimate disposition of Smith's Confrontation Clause claim. We note only that before the court can decide the primary purpose of the out-of-court statements introduced at Smith's trial, it needs to determine exactly what those statements were.

In then addressing the statements' primary purpose—why Rast created the report or notes—the court should consider the range of recordkeeping activities that lab analysts engage in. After all, some records of lab analysts will not have an evidentiary purpose. The United States as *amicus curiae* notes, for example, that lab records may come into being primarily to comply with laboratory accreditation requirements or to facilitate internal review and quality control. Or some analysts' notes may be written simply as reminders to self. In those cases, the record would not count as testimonial. To do so, the document's primary purpose must have "a focus on court." And again, the state court on remand should make that assessment as to each record whose substance Longoni conveyed. [*Id*. at ___; slip op at 20-21 (citations omitted).]

Here, in the trial court's November 11, 2022 opinion and order denying defendant's motion for a new trial, in discussing defendant's claim that trial counsel was ineffective for failing to object to the absence of testimony of the laboratory scientists who personally tested and prepared the DNA data, the court stated that the "final results from Sorensen" from BC's rape kit were "compiled by" Glover, and Glover, "through her analysis of the data concluded that there was an unidentified male profile recovered from the vaginal swab" of BC's rape kit. "Therefore the court does not believe the data generated to be analyzed is testimonial in nature and would require the testimony of each individual laboratory technician." This is the only time the trial court expressed any conclusion about whether the out-of-court statements were testimonial in nature, although several other testifying witnesses presumably relied on the same data. And unlike *Smith*, defendant does make an argument on appeal that they were testimonial.

Regardless of the trial court's conclusion, a remand is necessary for the trial court to determine whether the Sorensen data was testimonial in nature and to complete the Confrontation Clause analysis under the newly-provided framework in *Smith*. Similar to *Smith*, *id*. at ___; slip op at 20, the trial court needs to determine what of the Sorensen data and evidence are at issue because from the record, it is unclear. The parties simply refer to "raw data," but it is not clear what this includes, such as, raw numbers, notes, reports, etc. It is unclear what evidentiary purpose each record serves, as some may merely be part of Sorensen's recordkeeping activities. *Id*. at ___; slip op at 21. The testimonial nature of the evidence is not properly before this Court at this time given these uncertainties. Therefore, we remand this matter to the trial court to determine whether

the Sorensen data was testimonial and to complete the analysis of defendant's Confrontation Clause claim, bearing in mind the holding and guidance provided by *Smith*. See *id*. at ___; slip op at 22.

As an alternative argument, defendant argues that trial counsel's failure to object on Confrontation Clause grounds denied him effective assistance of counsel. To preserve a claim of ineffective assistance of counsel, a defendant must move, in the trial court, for a new trial or an evidentiary hearing under *People v Ginther,* 390 Mich 436; 212 NW2d 922 (1973). *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). Because defendant moved for a new trial on the ground of ineffective assistance, he requested an evidentiary hearing, and the trial court held the requested hearing, his claim of ineffective assistance of counsel is preserved for appellate review. "To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *People v Riley*, 468 Mich 135, 140; 659 NW2d 611 (2003). Simply put, because the *Smith* decision was very recently issued, in June 2024, and defendant's trial took place in 2019, we cannot conclude that defense counsel was ineffective for failing to object on Confrontation Clause grounds. Thus, defendant cannot meet his burden to prove that counsel's performance was deficient or that he was prejudiced by counsel's failure to object. *Id.*

## B. VIDEO TESTIMONY

For his next issue, defendant once again invokes the Confrontation Clause. He argues that the presentation of several witnesses through the use of two-way video technology deprived him of his right to confront those witness against him. Defendant tacitly concedes that his trial counsel, on his behalf, waived the right of confronting the seven witnesses in person.[5] This is apparent

---

[5] It appears undisputed that defendant's trial counsel waived the right to confront, in person, several witnesses that testified during his trial using two-way video technology. At the September 17, 2018 pretrial hearing, trial counsel indicated that he was not willing to stipulate that the prosecution could present their witnesses' testimony through video technology. Trial counsel stated that he would have to know who the witnesses were that the prosecution wished to present through video. At the June 20, 2019 pretrial hearing, trial counsel clearly stipulated that one DNA expert could testify by video technology. At the July 19, 2019 hearing, the parties placed on the record their agreement to allow "the DNA expert to testify via video[.]" Then, at trial, seven of the prosecution's witnesses testified by video technology: Grover (Sorenson), Smith (MSP), Lyons (MSP), Deleeuw (MSP), Pettis (Sorenson), Terry Lockard (retired nurse), and Dr. Stanley Materka (emergency room physician). There is no indication on the record that trial counsel specifically stipulated to more than one "DNA expert" testifying by video. However, at the *Ginther* hearing, trial counsel admitted that because the witnesses did, in fact, appear by video, it was likely that he did not object to the trial proceeding in this manner.

As discussed in Part II.A. of this opinion, the Confrontation Clauses of our state and federal constitutions provide that in all criminal prosecutions, the accused has the right to be confronted with the witnesses against him. US Const, Am VI; Const 1963, art 1, § 20. However, if the decision constitutes reasonable trial strategy, "[t]here is no doubt that the right of confrontation

because on appeal, defendant has framed the issue related to the video testimony in terms of ineffective assistance of counsel. A defendant who waives his Sixth Amendment right of confrontation through the action of counsel may seek relief by establishing that his attorney rendered ineffective assistance. *People v Buie*, 491 Mich 294, 306, 315 n 13; 817 NW2d 33 (2012). Defendant argues that trial counsel provided ineffective assistance by failing to assert his rights under the Confrontation Clause and failing to demand that these seven witnesses testify in person. We conclude, however, that defendant has failed to overcome the presumption that trial counsel's actions constituted sound trial strategy under the circumstances.

The issue of ineffective assistance of counsel is a mixed question of fact and law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Effective assistance of counsel is presumed and a defendant bears a heavy burden to prove otherwise. *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015). As stated above, defendant must show that counsel's performance was deficient and that it prejudiced the defense to establish a claim of ineffective assistance of counsel. *Riley*, 468 Mich at 140. "In order to demonstrate that counsel's performance was deficient, the defendant must show that it fell below an objective standard of reasonableness under prevailing professional norms. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy." *Id*. Establishing prejudice necessarily requires demonstrating a reasonable probability that the result of the proceedings would have been different but for counsel's error. *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). Further, defendant bears the burden of establishing the factual predicate for his claim. *Putman*, 309 Mich App at 248.

Defendant's trial counsel determined that the defense's theory would include mounting a challenge to protocols used—specifically, how the DNA kits were stored—to cast doubt on the credibility of the only evidence connecting defendant to the crime. Trial counsel elected to pursue this course by challenging the witnesses' testimony under MRE 703, arguing that the evidence upon which the DNA experts relied had not been admitted into evidence. Counsel determined that he could pursue this strategy regardless of whether the witnesses were present in the court room or by video technology. At the *Ginther* hearing, trial counsel explained his actions by comparing them to an alternative scenario. Trial counsel testified that had he been challenging the witnesses' statistical or mathematical calculations he would prefer that the witness appear in person. Trial counsel explained:

> [W]hen, specifically when I'm dealing with DNA experts I usually would want to have the person in the courtroom if I'm talking about, again, of facts not in evidence. How they came up with some of the calculations for some of those numbers that they come up with. You know one in how many, you know, sextillion or whatever that they come up with. And making them actually go through the math.
>
> Now when I do that that's when I cross-examine them on really their knowledge of probability and statistics. And [h]ow well they know the facts or the

---

may be waived and that waiver may be accomplished by counsel." *People v Buie*, 491 Mich 294, 306; 817 NW2d 33 (2012).

terms that they're actually testifying about. And generally when I do that if I have a jury in front of them I would like the jury to see how they handle the questions regarding the statistical findings.

Trial counsel then agreed that his decision whether to assert the confrontation right when it comes to experts depended on his theory of the case and what he was questioning the expert about.

The testimony of trial counsel reasonably suggests that there is certain testimony that is simply more impactful presented in person as opposed to over video. It this case, it would be reasonable for counsel to assume that expert testimony related to the scientific process would be blunted if given over video technology. Indeed, it is not unreasonable or uncommon for a defense attorney to stipulate to certain facts to prevent a damaging witness from personally appearing before the jury. It seems equally reasonable for an attorney to stipulate to the manner in which evidence is presented. By acquiescing to the presentation of DNA opinions by video, defense counsel minimized the damaging testimony.

Defendant has also failed to demonstrate that he was prejudiced by the witnesses testifying by video. Defendant's argument related to prejudice is focused solely on the premise that if trial counsel had objected to the video testimony on Confrontation Clause grounds, the testimony would have been precluded. He then reasons that because the only evidence linking him to the crime was the DNA testimony, he was prejudiced by its admission. However, defendant relies on a faulty premise. Had trial counsel successfully asserted either during pretrial proceedings, or even at trial, that video testimony violated his rights under the Confrontation Clause, it is not a foregone conclusion that the witnesses would not have testified. It is equally plausible that the prosecution would have been forced to bring the witnesses to the courthouse. The germane inquiry is whether defendant was prejudiced by the manner in which the evidence was presented. As discussed above, it could be legitimately argued that presenting the testimony by video minimized the impact of the experts' opinions. Defendant has not explained how he was prejudiced because of the manner in which the testimony was presented to the jury. A defendant may not simply claim error or announce a position and then leave it to this Court to "discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001) (quotation marks and citation omitted). Defendant has, in effect, abandoned this argument on appeal. In any event, it should be noted that although the witnesses appeared by video technology, defendant was able to cross-examine each witness thoroughly.

Defendant's trial counsel testified concerning his motivations and reasons for the actions he took. He believed that he could effectively challenge the witnesses' testimony under MRE 703, rather than under the Confrontation Clause, regardless of whether the witnesses appeared in person or by video. While it is obvious that another attorney might have handled the situation differently, there is insufficient proof to rebut the presumption that counsel acted strategically and reasonably. See *Buie*, 491 Mich at 317-318. Given counsel's testimony at the evidentiary hearing, it is clear that he made a reasonable, strategic decision not to contest the presentation of the testimony through two-way video technology. In general, "[t]his Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Traver (On Remand)*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019) (quotation marks and citation omitted). Trial strategy does not constitute ineffective assistance of counsel

simply because it was not successful. *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020).

### C.  OTHER-ACTS EVIDENCE

Defendant argues that the trial court erred by admitting evidence under MRE 404(b) related to the 1991 sexual assault of TW, including TW's own testimony and DNA evidence implicating defendant in the assault.  He asserts that the facts in this case are too dissimilar to those in the 1991 sexual assault of TW and that the other-acts evidence was more prejudicial than probative.  We disagree.  Because this evidence was properly admitted under MRE 404(b), defendant has failed to establish plain error that affected his substantial rights.

"To preserve an evidentiary issue for review, a party opposing the admission of the evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe,* 504 Mich 230, 252; 934 NW2d 693 (2019).  At the September 4, 2018 final pretrial hearing, the prosecutor reminded the court of its pending motion regarding the intent to admit MRE 404(b) evidence.  When the court questioned trial counsel regarding defendant's position, trial counsel indicted that he objected, without argument, to the admission of MRE 404(b) evidence.  Because the court had not reviewed the prosecution's notice of intent to offer other-acts evidence, it scheduled a hearing on the admissibility of the MRE 404(b) evidence for September 17, 2018.  At this hearing, trial counsel again indicated that he objected, without argument, to the admission of the evidence.  Because defendant did not state a reason for objecting to the other-acts evidence, this issue has not been preserved for appellate review.  "Unpreserved claims of evidentiary error are reviewed for plain error affecting the defendant's substantial rights." *Brown*, 326 Mich App at 195 (quotation marks and citation omitted).

Under MRE 404(b), evidence of other crimes, wrongs, or acts is inadmissible to prove a propensity to commit such acts.  *People v Denson*, 500 Mich 385, 397; 902 NW2d 306 (2017).  However, evidence of other acts may be admissible if offered for a proper purpose.  At the time of defendant's trial, MRE 404(b)(1) provided:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

In *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), the Michigan Supreme Court articulated the following test for the admission of other-acts evidence:

> First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury.

More recently, in *Denson*, the Supreme Court reiterated the standard for the admission of other-acts evidence set forth in *VanderVliet*. *Denson*, 500 Mich at 398. In addition, the Court explained that "in order to determine whether an articulated purpose is, in fact, merely a front for the improper admission of other-acts evidence, the trial court must closely scrutinize the logical relevance of the evidence under the second prong of the *VanderVliet* test." *Id*. at 400. In this regard, the Court in *Denson* stated: "Other-acts evidence is logically relevant if two components are present: materiality and probative value." *Id*. at 401. "Materiality is the requirement that the other-acts evidence be related to any fact that is of consequence to the action." *Id*. (quotation marks and citation omitted). "Evidence is probative if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id*. at 401-402 (quotation marks and citations omitted). Considering the foregoing principles, we conclude that the other-acts evidence was properly admitted in this case.

Initially, it should be noted that the prosecution filed a notice of intent to present other-acts evidence consistent with the requirements of MRE 404(b)(2). The prosecution asserted that evidence related to the 1991 sexual assault of TW would assist in establishing that defendant used a common scheme or plan when sexually assaulting his victims. The prosecution also argued that the evidence was relevant to show a lack of consensual sexual activity. Thus, the prosecution articulated a permissible purpose specifically identified in MRE 404(b)(1).

The second-prong of the *VanderVliet* test was similarly satisfied. The proposed other-acts evidence was also relevant because it had a tendency to make a fact of consequent more probable that it would be without the evidence. In *People v Sabin (After Remand)*, 463 Mich 43, 63; 614 NW2d 888 (2000), our Supreme Court explained that "evidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." The Court stated that "[g]eneral similarity between the charged and uncharged acts does not, however, by itself, establish a plan, scheme, or system used to commit the acts." *Id.* at 64. Instead, to be admissible, there must be a concurrence of common features of the other-acts evidence and the charged acts which manifests a general plan. *Id*. at 64-65. The other-acts evidence must support the inference that the defendant employed the common plan in committing the charged offense. *Id.* at 65-66. In *Denson*, our Supreme Court clarified and emphasized that there must be a "striking similarity" between the other act and the charged offense. *Denson*, 500 Mich at 403 (citation omitted).

The record showed that there were many similarities between the charged act—the sexual assault of BC, and the uncharged act—the 1991 sexual assault of TW. In both the 1991 incident and the present case, the assailant targeted a young woman in Detroit. Moreover, the assailant selected a victim that was a stranger to him. The alleged assaults both took place under the cover of night. The assailants in both cases wore a hoodie to, presumably, conceal his identify. Further, the assailant threatened the women with a weapon to force them to move to an isolated location that would facilitate the sexual assault. Indeed, both TW and the complainant in this case were sexually assaulted in abandoned, residential structures: complainant's assault occurred in an abandoned home and TW's occurred in the garage of an abandoned home. Moreover, those more isolated locations were in close proximity to where the perpetrator first encountered the victim. Both the complainant and TW were instructed to remove their pants and, in both cases, the assailant

-12-

forcefully penetrated their vaginas with his penis. From these common features, a jury could reasonably conclude that defendant employed a system or plan that involved targeting young women in Detroit, taking them to a nearby isolated area, sexually assaulting them, and using a weapon to enable him to perpetrate the sexual abuse.

Admittedly, there are some dissimilarities between the other act and the present case. In this case, the perpetrator used a gun while TW was threatened with a knife. Further, in this case, it is alleged that defendant stole money and jewelry from BC and KS. This variance could easily be explained by the fact that TW, a 14 year old girl returning home after studying with a friend, simply had nothing to steal. That some dissimilarities exist does not render the otherwise admissible evidence inadmissible. *Id*. at 67. Instead, the alleged differences can allow "reasonable persons [to] disagree on whether the charged and uncharged acts contained sufficient common features to infer the existence of a common system used by [the] defendant in committing the acts." *Id*.

Defendant also asserts on appeal that the probative value of the other-acts evidence was substantially outweighed by the danger of unfair prejudice. We disagree. When evaluating the prejudicial effect of proffered evidence, this Court has advised lower courts to consider

> the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock. Moreover, admission of [e]vidence is unfairly prejudicial when . . . [the danger exists] that marginally probative evidence will be given undue or preemptive weight by the jury. [*People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011) (quotation marks and citations omitted; alterations in original).]

During closing arguments, the prosecutor briefly addressed the similarities between the two assaults and thereafter confined the arguments related to the other-acts evidence to the purpose for which the evidence was admitted. In addition, the court minimized any potential prejudicial effect by giving a thorough limiting instruction. The jury was instructed in regard to the proper use and consideration of the other-acts evidence during trial.

The evidence was offered for a noncharacter purpose. It was relevant to establishing an element to the charged offense and probative of the ultimate issues. The other-acts evidence supported the reasonable inference that defendant intended to force a young woman to engage in unconsented sex by employing a strikingly similar plan, scheme, or system to commit the sexual assault. Accordingly, the trial court did not commit plain error when it permitted the prosecution to introduce other-acts evidence during defendant's trial.

As an alternative argument, defendant asserts that his trial counsel's failure to articulate a basis for his bare objection to the MRE 404(b) evidence deprived him of the effective assistance of counsel. We disagree. As discussed above, the other-acts evidence was properly admitted for a permissible purpose. Therefore, any objection by defense counsel, regardless of the basis, would have been unsuccessful. "This Court will not find trial counsel to be ineffective where an objection would have been futile[.]" *Ogilvie*, 341 Mich App at 34. Accordingly, defendant's alternative argument asserting ineffective assistance fails. *Id*.

## D. MOTION FOR MISTRIAL

Defendant asserts that the trial court erred when it denied his motion for a mistrial at the close of the prosecution's proofs. "A motion for a mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant and impairs the defendant's ability to get a fair trial." *People v Dickinson*, 321 Mich App 1, 18; 909 NW2d 24 (2017) (quotation marks and citation omitted). "A mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Gonzales*, 193 Mich App 263, 266: 483 NW2d 458 (1992). This Court reviews for an abuse of discretion a trial court's decision on a motion for a mistrial. *People v Dennis*, 464 Mich 567, 572; 628 NW2d 502 (2001). An abuse of discretion occurs when the result is outside the range of principled outcomes. *People v March*, 499 Mich 389, 397; 886 NW2d 396 (2016). After reviewing the record, we find that because there were no irregularities that prejudiced defendant or deprived him of a fair trial, the trial court did not abuse its discretion when it denied defendant's motion for a mistrial.

During trial, relative to the other-acts evidence, the prosecution presented the testimony of several DNA analysts to establish that defendant's DNA profile matched the unknown male DNA profile found in TW's sexual assault kit. On appeal, defendant asserts that he was entitled to a mistrial at the close of the prosecution's proofs where the court erred in admitting other-acts evidence, specifically the related DNA evidence from TW. Defendant essentially argues that the other-acts DNA evidence lacked a proper foundation because there were missing links in the chain of custody of TW's sexual assault kit. Defendant asserts that because the chain of custody was not properly established, there was insufficient evidence that the DNA tested and found to match defendant's DNA profile actually came from TW during a sexual assault examination. Defendant takes particular issue with the fact that nobody testified about taking the samples from TW and sealing them in the kit. Defendant reasons that because a proper chain of custody was not established for the TW kit, all the testimony regarding the testing of the kit lacked the requisite foundation and should have been excluded. Defendant's argument is legally and factually without merit.

TW testified that after she was sexually assaulted, she was taken to the hospital where she underwent a pelvic examination. She testified that her vagina was swabbed and that a doctor retrieved a condom from her vagina. Outside the presence of the jury, the prosecutor informed the court that it would be impossible to bring in the medical professionals that performed the sexual assault examination and prepared the kit because TW's medical records from Children's Hospital had been purged. Sergeant Derrick Dixon, a Detroit police officer assigned to the property control unit, testified that a tag on the kit purporting to be TW's showed that it was taken from Children's Hospital on February 5, 1991. However, because the Detroit Police Department changed their property tracking system in the early 1990s, Dixon could only confirm that TW's sexual assault kit was in the custody of the Detroit Police Department as of September 8, 1995. Other documents that Dixon reviewed indicated that TW's kit was sent to Sorenson on December 10, 2013. Dixon identified a chain of custody report corresponding to the sexual assault kit. Pettis, a DNA analyst formerly employed by Sorenson, testified that he prepared a report, dated October 27, 2014, in TW's case. He confirmed that Sorenson received for analysis a condom; vaginal, rectal, and oral swabs; and two reference samples from TW. It should also be noted that the tracking numbers on the kit identified by Pettis matched the tracking numbers Dixon attributed to TW's kit. Smith, a MSP forensic scientist, similarly testified that a kit purporting to be TW's included a condom;

vaginal, rectal, and oral swabs; and a reference sample from TW. In April 2015, Smith authored a report relative to the kit purporting to be TW's.

"In order to obtain the admission of real evidence, a prosecutor must lay a foundation identifying the items as what they are purported to be and displaying that the items are connected with the accused or the crime." *People v Jennings*, 118 Mich App 318, 322; 324 NW2d 625 (1982).[6] See also MRE 901(a). When determining if an object should be admitted, the trial court should consider the nature of the article, the circumstances surrounding the preservation and custody of it, and the possibility of intermeddlers tampering with it. *People v Muhammad*, 326 Mich App 40, 59; 931 NW2d 20 (2018). Admission of evidence "does not require a perfect chain of custody," and "any deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility once the proffered evidence is shown to a reasonable degree of certainty to be what its proponent claims." *People v White*, 208 Mich App 126, 130-131; 527 NW2d 34 (1994).

In this case, based on the record, there seems little doubt that the sexual assault kit tested, and the DNA profiles produced, were from a sexual assault kit prepared during the sexual assault examination performed on TW at Children's Hospital. The witnesses that had contact with the kit established a chain of custody sufficient to corroborate that the evidence was what it was purported to be. Moreover, it is notable that defendant does not contend that any person or lab lost, misidentified, or tampered with the body fluid samples. Under the circumstances, because the bodily fluids tested were genuine, any break in the chain of custody was not fatal to the admission of the challenged evidence. Accordingly, defendant has failed to demonstrate that the trial court erred when it denied his motion for a mistrial.

E.  JURY INSTRUCTIONS—UNANIMITY

For his last issue on appeal, defendant raises an instructional error. Regarding the first-degree criminal-sexual-conduct charge, the court gave the following instruction:

As to count one, the Defendant is charged with the crime of First Degree Criminal Sexual Conduct. To prove this charge, the Prosecutor must prove each of the following elements beyond a reasonable doubt.

First, that the Defendant engaged in a sexual act that involved entry into [the complainant's] genital opening by the Defendant's penis. Any injury, no matter how slight is enough. It does not matter whether the sexual act was completed, or whether semen was ejaculated.

Second, that the sexual penetration occurred under any one of the following circumstances; that the Defendant was armed at the time with a weapon or with an

_____

[6] Decisions issued before November 1, 1990, are not binding precedent. MCR 7.215(J)(1). "Although we are not strictly required to follow uncontradicted opinions from this Court decided prior to November 1, 1990, those opinions are nonetheless considered to be precedent and entitled to significantly greater deference than are unpublished cases." *People v Bennett*, 344 Mich App 12, 17 n 4; 999 NW2d 827 (2022).

object used or fashioned in a manner to lead [the complainant] to reasonably believe that it was a weapon[;] [t]hat the alleged sexual act occurred under circumstances that also involved kidnapping, . . . [a]nd, that the alleged sexual and or—and that the alleged sexual act occurred under circumstances that also involved larceny from a person.

On the need for unanimity, the court instructed the jury:

> A verdict in a criminal case must be unanimous. In order to return a verdict, it is necessary that each of you agrees on that verdict.

On appeal, defendant argues that the trial court erroneously instructed the jury when it failed to instruct that in addition to agreeing that a penetration occurred, the jury must also agree on which aggravating circumstance, i.e., weapon, kidnapping, or larceny, occurred in order to convict defendant of CSC-I. According to defendant, because no special unanimity instruction was given, the jury might have unanimously agreed on the general existence of aggravating circumstances without unanimously agreeing on the existence of any one of the aggravating circumstances in particular. Alternatively, defendant asserts that the failure to request such an instruction constituted ineffective assistance of counsel. Defendant's arguments are contrary to existing legal authority.

To preserve an argument that the trial court erroneously instructed the jury, a party must challenge the erroneous instruction in the trial court. *People v Czuprynski*, 325 Mich App 449, 466; 926 NW2d 282 (2018). If a party expresses satisfaction with the jury instructions as given, the issue is waived, and there is no error to review. *People v Kowalski*, 489 Mich 488, 503-504; 803 NW2d 200 (2011). In this case, after closing arguments, the court briefly adjourned to discuss jury instructions with the parties. When the matter resumed, the court asked if both attorneys had an opportunity to go over the final jury instructions and if they were satisfied with the jury instructions. Trial counsel and the prosecutor replied in the affirmative to both questions. Then, after the court instructed the jury, it asked the attorneys if they were satisfied with the instructions that had been given to the jury. Defendant's trial counsel replied in the affirmative. In light of the foregoing events, defendant's substantive claim of instructional error is waived. By affirmatively approving the instructions as given, trial counsel waived any error. *People v McDonald*, 293 Mich App 292, 295; 811 NW2d 507 (2011). "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *Kowalski*, 489 Mich at 503 (quotation marks and citation omitted).

Alternatively, defendant argues that his trial counsel's failure to request an instruction that the jurors must agree on which aggravating circumstance was present deprived him of effective assistance of counsel. We disagree.

"To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *Riley*, 468 Mich at 140. "In order to demonstrate that counsel's performance was deficient, the defendant must show that it fell below an objective standard of reasonableness under prevailing professional norms. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy." *Id*. Establishing prejudice

necessarily requires demonstrating a reasonable probability that the result of the proceedings would have been different but for counsel's error. *Nix*, 301 Mich App at 207.

Because the jury was properly instructed regarding unanimity, defendant cannot establish that trial counsel's representation was deficient. This exact jury instruction issue was resolved by this Court in *People v Gadomski*, 232 Mich App 24; 592 NW2d 75 (1998). In *Gadomski,* the defendant was charged and convicted of CSC-I. *Id*. at 26. The jury in that case was instructed, just as in this case, that it was required to find the defendant engaged in penetration and that this act was accompanied by at least one of three alternative aggravating circumstances—home invasion, aiding and abetting, or personal injury. *Id*. at 29, citing MCL 750.520b(1)(c), (1)(d)(*ii*), and (1)(f). The defendant in *Gadomski* advanced the same arguments as defendant asserts in the present case. *Id*. at 29-30. In rejecting the defendant's position, and finding that there was no instructional error, this Court stated:

> Michigan criminal juries are not required to unanimously agree upon every fact supporting a guilty verdict. See, e.g., *People v Espinosa*, 142 Mich App 99, 105; 369 NW2d 265 (1985) (explaining that, in theory, a defendant could be convicted of murder by a jury in which six members were of the opinion that the defendant shot the victim acting as the principal, and the other six members were of the opinion that he aided and abetted another). More specifically, it is well settled that when a statute lists alternative means of committing an offense, which means in and of themselves do not constitute separate and distinct offenses, jury unanimity is not required with regard to the alternate theories. . . . That was the case here. *Where there is a single sexual penetration, the various aggravating circumstances listed in MCL § 750.520b; MSA 28.788(2), constitute alternative means of proving a single CSC I offense, and would not support convictions of separate and distinct CSC I offenses. . . . Accordingly, defendant would have been properly convicted of CSC I even if some of [the] jurors believed that he committed the offense solely on the basis of one aggravating circumstance, while the rest of the jurors believed that he committed the offense solely on the basis of another one of the aggravating circumstances.* [*Id*. at 31-32 (Emphasis added).]

The Court in *Gadomski* ultimately held there was no instructional error. *Id*. at 32-33. In light of the foregoing precedent, a specific-unanimity instruction was not warranted in this case.

Moreover, defendant cannot establish that any alleged deficient performance prejudiced his defense. In addition to the CSC-I charge, defendant was found guilty of two counts of kidnapping. Accordingly, even if the court had instructed the jury as suggested, he still would have been convicted on the CSC-I charge because it is clear that all of the jurors agreed that a penetration occurred and defendant kidnapped the complainants. There was no reasonable probability that the results of the proceedings would have been different but for counsel's errors. No special unanimity instruction was required, *Gadomski*, 232 Mich at 32, and counsel was not ineffective for failing to advance a meritless argument, *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## III. CONCLUSION

We vacate Part II. A. of the trial court order denying defendant's motion for a new trial only, and remand to the trial court to determine whether the out-of-court statements regarding the DNA data were testimonial in nature, to complete the analysis of defendant's Confrontation Clause claim, and for further proceedings in accordance with this opinion. In all other respects, we affirm. We do not retain jurisdiction.

/s/ Kathleen Jansen
/s/ James Robert Redford
/s/ David H. Sawyer