*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DWAND DONTRELL CARTER,

Defendant-Appellant.

UNPUBLISHED
May 14, 2026
2:58 PM

No. 364432
Berrien Circuit Court
LC No. 2021-004166-FC

Before: MURRAY, P.J., and REDFORD and RICK, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of two counts of first-degree premeditated murder, MCL 750.316(1)(a); one count of being a felon in possession of a firearm, MCL 750.224f (felon-in-possession); three counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b; and one count of carrying a concealed weapon, MCL 750.227. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to life imprisonment without parole for each murder conviction; 40 to 60 months' imprisonment for the felon-in-possession conviction; two years' imprisonment for each felony-firearm conviction; and 76 to 150 months' incarceration for carrying a concealed weapon. The trial court ordered that the multiple counts of felony-firearm should be served concurrently, along with the sentence for carrying a concealed weapon, but consecutive to any sentence for a parole violation, and that the sentences for the remaining felony convictions should be concurrent with each other and consecutive to the two-year terms for felony-firearm. Defendant now appeals as of right. We affirm.

## I. BACKGROUND

Defendant's convictions arise out of events that occurred on December 24, 2021, in Benton Harbor, Michigan. At approximately 3:00 p.m. on that day, the victims, Ayria McDowell and Kevin Hill, were shot to death while sitting in a vehicle parked in a vacant lot next to the house Kevin shared with his mother. The prosecution presented the theory that jealousy and anger caused defendant to kill his on-again, off-again girlfriend and her new boyfriend. There were no witnesses to the shootings, and a murder weapon was never found. However, several witnesses saw a man

-1-

dressed all in black except for a red ski mask type hat, red shoes, and red gloves. Several witnesses placed this individual in the vicinity of the shooting at the time multiple gunshots were heard. One witness, mail carrier Sophia Miles, identified defendant as the individual dressed in black and red. Miles further testified that she saw defendant driving a black Dodge Durango near the scene of the shootings in close proximity to the time of the shootings. Although the Durango was never located, investigators testified that a black Dodge Durango was registered in defendant's name.

After the jury convicted defendant of the charged offenses, defendant appealed to this Court. Then, defendant filed a motion for a new trial in the trial court. Before the trial court considered defendant's motion, defendant withdrew any claim of ineffective assistance of counsel. Thereafter, the trial court, finding no merit to the multiple issues raised by defendant, denied the motion for new trial.

## II. ANALYSIS OF THE ISSUES

### A. PREARREST SILENCE

Defendant argues that his convictions must be reversed because the prosecutor impermissibly elicited testimony of and commented on defendant's prearrest silence after a family friend implored him to contact the police to discuss Ayria's death and he failed to do so. Defendant asserts that his silence was used as a tacit admission of guilt and as a result, it violated his constitutional right to remain silent. However, a review of the applicable legal authority compels a finding that defendant's prearrest silence was not entitled to constitutional protection.

To preserve a constitutional claim, such as one involving the due-process right to a fair trial, a defendant must object on that ground in the trial court. *People v Brown*, 326 Mich App 185, 191-192; 926 NW2d 879 (2019). Similarly, "[i]n order to preserve an issue of prosecutorial misconduct,[1] a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Defendant did not object to the prosecution's examination of Robin Hamilton regarding defendant's prearrest silence, nor did he object to comments made by the prosecutor during closing argument or in rebuttal. Moreover, defendant admits that this issue is unpreserved. Unpreserved constitutional claims are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Similarly, unpreserved claims of prosecutorial error are also subject to the plain-error analysis. *People v Clark*, 330 Mich App 392, 433; 948 NW2d 604 (2019). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. In general, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings. *Id*. Once these requirements are satisfied, "an appellate court must exercise its discretion in deciding whether to reverse." *Id*. Reversal is not warranted if the

---

[1] This Court explained in *People v Cooper*, 309 Mich App 74, 87-88; 897 NW2d 452 (2015), that a more appropriate label for most claims of prosecutorial misconduct would be "prosecutorial error," and that only the most extreme cases would rise to the level of prosecutorial misconduct.

plain, forfeited error does not seriously affect the fairness, integrity, or public reputation of judicial proceedings or result in the conviction of an actually innocent defendant. *Id*. at 763-764.

During its case-in-chief, the prosecution called as a witness Hamilton, Ayria's aunt. Much of the examination was about the efforts of Hamilton and her husband to negotiate a reconciliation between defendant and Ayria in November 2021. However, relevant to this issue on appeal, Hamilton also testified that on December 24, 2021, she received a call from a friend telling her to come to Buss Avenue because something was wrong with Ayria. When Hamilton arrived at the scene, she learned that Ayria had been shot. While she remained with other bystanders on Buss Avenue, Hamilton spoke to some of the detectives. Either when she returned home or while at the scene, Hamilton called defendant. The prosecutor asked Hamilton what she and defendant spoke about during this phone call. In response, Hamilton testified:

> *Q*. And did you tell him anything, did you tell him to do anything?
>
> *A*. I said have you heard what happened to Ayria, do you know what is going on? And he started crying and said the town is saying I done it, but Auntie Robin I didn't. I loved her.
>
> *Q*. All right. Did you tell him to go to the police and talk to them?
>
> *A*. Oh, the detective was there and they then—I said Wan, they would like to speak to you. If you don't mind, would you be so kind. They just want to talk to you. Nothing bad, because you were her ex. And would you go to talk to [Michigan State Police Trooper] Kelly [Anderson]?
>
> *Q*. All right.
>
> *A*. And he said he would.

Later, Hamilton also testified:

> *Q*. Did he say anything else to you?
>
> *A*. No. We hung up. And then I called him. Kelly wanted to just talk to him.
>
> *Q*. Okay.
>
> *A*. A little later, and asked him would he go talk to her, and he said yes.

After the foregoing testimony, the prosecution recalled Trooper Anderson, who testified that defendant never contacted her. In its rebuttal argument, the prosecution briefly referenced evidence that Hamilton told defendant to contact the police, and he did not.

Defendant argues that the prosecutor impermissibly used his silence as substantive evidence of his guilt by creating an inference that if defendant had nothing to hide, he would have contacted the police when he knew they wanted to talk to him. We disagree.

Both the state and federal constitutions provide that no person shall be compelled in a criminal case to be a witness against himself. US Const, Am V; Const 1963, art 1, § 17. Accordingly, a defendant's right to due process is violated when a prosecutor uses a defendant's postarrest, post-*Miranda*[2] warning silence for impeachment or as substantive evidence "unless it is used to contradict the defendant's trial testimony that he made a statement, that he cooperated with police, or that trial was his first opportunity to explain his version of events." *People v Solmonson*, 261 Mich App 657, 664; 683 NW2d 761 (2004). However, "where a defendant has received no *Miranda* warnings, no constitutional difficulties arise from using the defendant's silence before or after arrest as substantive evidence unless there is reason to conclude that his silence was attributable to the invocation of the defendant's Fifth Amendment privilege." *Id*. at 664-665. Indeed, "the fact that a citizen has a constitutional right to remain silent when he is questioned has no bearing on the probative significance of his silence before he has any contact with the police." *People v Schollaert*, 194 Mich App 158, 164-165; 486 NW2d 312 (1992), citing *Jenkins v Anderson*, 447 US 231, 243-244; 100 S Ct 2124; 65 L Ed 2d 86 (1980) (STEVENS, J., concurring).

In *Schollaert*, 194 Mich App at 164, this Court considered "whether the admission as substantive evidence of testimony concerning a defendant's silence before custodial interrogation and before the *Miranda* warnings have been given is a violation of the defendant's constitutional rights." Considering both state and federal precedent, this Court held that it is not. *Id*.

In *Schollaert*, the prosecutor elicited testimony of and commented on the defendant's silence when sheriff's deputies went to the defendant's home at 3:30 a.m. shortly after the murders were reported, to take the defendant in for questioning. *Id*. at 160-161. During closing arguments, the prosecutor argued that the defendant never asked why the police were in his home in the early morning hours. *Id*. at 161. The defendant argued that the prosecutor impermissibly used his silence as substantive evidence of his guilt "by inferring that an innocent person would have asked why he was being taken in for questioning at 3:30 in the morning." *Id*. This Court found that the prosecutor's actions did not violate the defendant's constitutional rights. It began by noting that the relevant inquiry "is whether [the defendant] was subjected to police interrogation while in custody or deprived of his freedom of action in a significant way." *Id*. at 165. Continuing, the Court explained:

> In the present case, defendant's silence or non-responsive conduct did not occur during a custodial interrogation situation, nor was it in reliance on the *Miranda* warnings. Therefore, we believe that defendant's silence, like the "silence" of the defendant in [*People v McReavy*, 436 Mich 197; 462 NW2d 1 (1990)], was not a constitutionally protected silence. On the basis of our reading of the Michigan Constitution, together with developments in Fifth and Fourteenth Amendment jurisprudence, we conclude that defendant's constitutional rights were not violated when evidence of his silence was admitted as substantive evidence. [*Schollaert*, 194 Mich App at 166-167.]

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

This Court has continued to recognize that a defendant's constitutional right to remain silent is not violated by the prosecutor's comment on his silence before custodial interrogation and before *Miranda* warnings have been given. See *People v McGhee*, 268 Mich App 600, 634; 709 NW2d 595 (2005). While the right against self-incrimination prohibits a prosecutor from commenting on the defendant's silence in the face of accusation, it does not curtail the prosecutor's conduct when the silence occurred before any police contact. *People v Goodin*, 257 Mich App 425, 432; 668 NW2d 392 (2003).

The Court's decision in *Schollaert*, and other similar cases, is instructive and applicable to the circumstances in the present appeal. Defendant was not the subject of a custodial interrogation when he allegedly decided to remain silent and ignore a request that he contact the lead investigator. Nor did his silence occur in the face of an accusation or after he was advised of his right to remain silent. Indeed, during the applicable timeframe, defendant had only spoken to Ayria's aunt, he never invoked his Fifth Amendment right to remain silent, and he was never given *Miranda* warnings. Simply put, defendant's prearrest silence was not a constitutionally protected silence. Accordingly, defendant's constitutional rights were not violated when evidence of his prearrest conduct was admitted as substantive evidence.

Notably, in *Schollaert*, after concluding that the defendant's silence was not a constitutionally protected silence, the Court then considered whether the testimony regarding the defendant's failure to question why the sheriff's deputies were at his home was admissible under the Michigan Rules of Evidence. The Court concluded that the defendant's failure to question the presence of the deputies was relevant to his consciousness of guilt. *Schollaert*, 194 Mich App at 167. In this case, an argument can also be made that evidence of defendant's prearrest conduct was relevant to his consciousness of guilt and to rebut defendant's assertion that the lead investigator did not properly investigate the case.

During closing arguments, defendant seemed to suggest that Trooper Anderson did not do a thorough investigation. For example, defendant's attorney criticized the trooper's failure to contact the secretary of state to ascertain how many black Dodge Durangos were in the city of Benton Harbor, arguing, "Wouldn't you want that at the minimum to find out are there any other cars matching the descript of the defendant's car." Defense counsel also criticized the investigating officer for not contacting defendant's mother. Then, defense counsel referenced the conversation between defendant and Hamilton. Defendant suggested that the police did not have defendant's name as a potential suspect until Hamilton asked an officer at the scene if defendant was the perpetrator.

In its rebuttal argument, the prosecution noted the arguments made in defendant's closing and replied by arguing, among other things, that Trooper Anderson tried to talk to defendant's mother, but she never returned the trooper's calls. The prosecutor also noted that "Robin Hamilton testified she told the Defendant to call the police. Kelly Anderson never heard anything from him." Contrary to defendant's assertions, as discussed above, the prosecutor did not reference defendant's conduct so that the jury could conclude defendant was guilty. Instead, the prosecutor's comment was no more than a response to defendant's suggestion that the law enforcement conducted a sloppy investigation. See, e.g., *People v Kennebrew*, 220 Mich App 601, 608; 560 NW2d 354 (1996).

Because defendant's prearrest silence was not constitutionally protected, he has not shown that the prosecutor violated his Fifth Amendment right to remain silent. Because defendant has failed to demonstrate plain error that affected his substantial rights, no relief is warranted.

## B. VOUCHING

Next, defendant argues that he was denied a fair trial because Trooper Anderson vouched for the reliability of Miles's identification of defendant. Specifically, defendant argues that Trooper Anderson opined that seeing photographs of defendant on the news did not affect or influence Miles's identification of defendant in a photographic lineup. Defendant admits that this claim of error is unpreserved. Unpreserved constitutional claims are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763. Similarly, unpreserved evidentiary issues are reviewed for plain error affecting substantial rights. *People v Lowrey*, 342 Mich App 99, 108; 993 NW2d 62 (2022). Because defendant has not established plain error that affected his substantial rights, he is not entitled to any relief in this regard.

During trial, Miles identified defendant as the man she saw walking down a path near the vacant lot where the murders occurred. She testified that shortly before hearing the gunshots nearby, she saw defendant pull a red "ski-mask type hat" over his face and don black latex gloves. Miles further recalled seeing the butt end of a gun sticking out of defendant's hoodie pocket, and she noticed the weight of the gun in the pocket. Miles testified that she saw defendant three times and had an opportunity to see his face. Defendant caught her attention because she thought he was handsome, and she particularly noted his lips. On cross-examination, defendant's counsel thoroughly challenged Miles on the description she gave to police and her ability to identify defendant. Miles admitted that sometime before viewing the photographic lineup, she saw a picture of defendant on the news. Again, defendant's counsel cross-examined Miles regarding whether seeing defendant's picture on the news influenced her identification of defendant. Then, on redirect examination, Miles denied that she identified defendant in the photographic lineup because she saw a picture of him on the television news before viewing the lineup. Miles testified that she identified defendant because she saw him in the area with a gun. Indeed, Miles testified that when she saw defendant's picture on the television, she thought to herself, that is the individual who did it.

Later, defendant's counsel questioned Trooper Anderson about the fact that Miles had seen a picture of defendant on the television before viewing the photographic lineup. Trooper Anderson testified on cross-examination that she did not recall if she knew that Miles had seen a photograph of defendant before viewing the photographic lineup. If Miles had revealed this information, it likely would have been put in the report. Because this information was not in the report, Trooper Anderson agreed that Miles must not have disclosed it. Defendant's counsel then specifically asked for Trooper Anderson's opinion regarding the effect of seeing a picture of the suspect before making an identification:

> *Q*. Doesn't that in a way corrupt identification if a person has already saw on the news, saw a photograph of a person that's of interests.
>
> *A*. Not necessarily.

*Q.* Not at all, ma'am?

*A.* Not necessarily.

Later, on redirect examination, the prosecutor questioned Trooper Anderson about the lineup and defense counsel's earlier questioning in this regard:

*Q.* And [defense counsel] is trying to get you to say that the identification is—from the lineup is somehow—I think the word he used was corrupt, because she looked at an image on the television that the news put up. How does that corrupt her identification if she saw what she saw with her own eyes on that day, and then as she said—I won't use the language she said, but she sees him on TV and says oh, well that's him there?

*A.* Correct.

*Q.* Does that in any way corrupt that original identification that she saw with her own eyes?

*A.* No.

Generally, it is the province of the jury to determine the credibility of the witnesses before it. *People v Musser*, 494 Mich 337, 348-349; 835 NW2d 319 (2013). Because this is so, it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial. *Id.* at 349. However, nowhere in the testimony did Trooper Anderson offer an opinion that defendant was the perpetrator of the murders or that Miles was being truthful. However, even if Trooper Anderson's testimony amounted to improper vouching, defendant's role in placing the challenged testimony before the jury cannot be ignored.

Defendant's trial attorney specifically asked Trooper Anderson to give an opinion as to whether viewing a picture of an individual could influence a subsequent identification. On cross-examination, defendant's trial attorney set up the sequence of questions that led to Trooper Anderson eventually giving her opinion that Miles's viewing of defendant's picture on the television did not "corrupt" the subsequent identification of defendant during the photographic lineup. Defendant's trial attorney invited the testimony to which defendant now objects. Defendant cannot complain about testimony he expressly invited. See *People v McPherson*, 263 Mich App 124, 139; 687 NW2d 370 (2004) ("Under the doctrine of invited error, a party waives the right to seek appellate review when the party's own conduct directly causes the error."). Accordingly, because defendant has not established plain error, relief is not warranted on this basis.

## C. PROSECUTORIAL MISCONDUCT

Next, defendant argues that the prosecutor improperly elicited testimony suggesting that defendant was a gang member or that the killings were gang related. Defendant did not object to this alleged error, and he admits that it is unpreserved. Accordingly, this issue is subject to a plain-error analysis. *Carines*, 460 Mich at 763; *Clark*, 330 Mich App at 433. After reviewing the record, it is clear that defendant has failed to establish that plain error occurred that affected his substantial rights.

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). When a defendant's prosecutorial error argument is "essentially an evidentiary issue framed as prosecutorial misconduct," this Court considers whether the prosecutor acted in good faith. *Id*. at 70-71. "A prosecutor's good-faith effort to admit relevant evidence does not constitute misconduct." *Id*. Issues of prosecutorial misconduct are decided case by case, and this Court evaluates a prosecutor's alleged misconduct in context. *People v Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016).

On cross-examination, defendant's attorney asked Detective Robert Shepherd whether it was common for someone intending to commit murder to wear conspicuous red shoes, gloves, and a hat. Detective Shepherd testified that he was sure it had happened before, but he would not be able to say whether it would be common or uncommon. Defense counsel continued with this line of questioning:

> *Q*. In your experience if you want to commit a murder you don't be conspicuous do you?
>
> *A*. Some people do.
>
> *Q*. Some people don't.
>
> *A*. Correct.
>
> *Q*. So my question is on the floor. If you're going to commit a murder in broad daylight would you wear red shoes, black outfit, red hat, red gloves, and walk down the middle of the street?
>
> *A*. If I was going to commit a murder I would not.

Defense counsel was clearly attempting to elicit testimony to support the suggestion that no one who intended to commit murder would wear conspicuously colored clothing.

On redirect examination, the prosecution revisited this line of inquiry. When asked by the prosecutor if there was any significance to someone wearing red, Detective Shepherd responded no. When the court sustained defendant's objection to the form of the question, the prosecutor rephrased the question and asked, "In your police experience is there any significance to the color red with an individual." Detective Shepherd responded: "Short of having a gang tie or something like that? No." In response to the follow-up question "what would the gang tie be if it were red," Detective Shepherd explained: "The Bloods gang wears a lot of red. The Vice Lords wear a lot of red. I mean, different gangs have different color ties that they—that they wear. Or, color preferences that they wear." Immediately thereafter, on recross-examination, the following exchange occurred between defendant's counsel and the witness:

> *Q*. Have you heard of a gang called the 30 Thugs, or the Thug 30?
>
> *A*. I have.

*Q.* It's present in Berrien County?

*A.* It's one of our much older gangs, yes.

*Q.* Okay. Do you have any experience with the Thug 30? Is it Thug 30 or 30 Thug?

*A.* It's 30 Thugs and I don't really have any experience with them. I mean, I've talked to members, but as far as dealing with them, no. I've never had a case on them or anything like that.

*Q.* What's their colors?

*A.* That I don't know.

At the outset, we note that the record does not support defendant's representation that the elicited testimony suggested that defendant was the member of a gang or that the shootings were gang related. The prosecutor did not ask if defendant was affiliated with any gangs. Moreover, the prosecution consistently maintained throughout the trial that defendant killed the victims because of jealousy, anger, and hatred. No other witnesses were questioned about gang membership or gang-related activities. The prosecution never once mentioned or even hinted in its closing or rebuttal arguments that defendant was in a gang or that the shootings were gang related. As the appellant, defendant bears the burden of presenting something from the record to verify the factual basis of any argument upon which reversal is sought. See, e.g., *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). Defendant has not met this burden.

Moreover, it is clear from the record that the prosecution was attempting to rebut defendant's suggestion that he could not possibly be the perpetrator of the killings because he was conspicuously dressed in red. "[T]he test of whether rebuttal evidence was properly admitted is . . . whether the evidence is properly responsive to evidence introduced or a theory developed by the defendant." *People v Thorpe*, 504 Mich 230, 254; 934 NW2d 693 (2019) (quotation marks and citation omitted; alteration in original). Defendant introduced a theory that the man in red and black could not possibly be the perpetrator because no one would wear such conspicuous colors to commit a crime. To rebut this suggestion, the prosecutor elicited testimony to establish that there might be reasons why an individual would wear red. "[P]rosecutorial misconduct cannot be predicated on good-faith efforts to admit evidence." *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999). The prosecutor was simply attempting to respond to defendant's theory, and the elicited testimony was for a proper purpose. Even if the disputed testimony should not have been admitted, defendant has not offered anything to support the conclusion that the prosecutor did not act in good faith when he asked questions of Detective Shepherd. On this record, there was no plain error with respect to the conduct challenged on appeal.

D. CONSTITUTIONALITY OF MCL 768.27b

Lastly, defendant challenges the constitutionality of MCL 768.27b. Defendant did not challenge the constitutionality of this statute before or during trial. However, after defendant appealed to this Court, defendant filed a motion for new trial in the trial court. In this motion,

defendant, for the first time, challenged the constitutionality of MCL 768.27b. Because a defendant may raise a constitutional issue for the first time in a motion for new trial, without a contemporaneous objection, this issue is preserved. *People v Dixon*, 217 Mich App 400, 409; 552 NW2d 663 (1996). The constitutionality of a statute is a question of law that this Court reviews de novo. *People v McKinley*, 496 Mich 410, 415; 852 NW2d 770 (2014).

Consistent with the requirements of MCL 768.27b, the prosecution filed a notice of intent to use evidence of other acts of domestic violence. In addition, in a related motion, the prosecution moved to admit hearsay evidence under MRE 803(1), (2), and (24).[3] The trial court granted in part and denied in part defendant's motion to exclude hearsay and other-acts evidence.[4]

At the time of defendant's trial, MCL 768.27b provided:

> (1) Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.[5]

---

[3] Substantial amendments to the Michigan Rules of Evidence went into effect on January 1, 2024. See 512 Mich _____ (2023). This opinion relies on the preamendment version of the rules in effect at defendant's trial.

[4] The court ordered that under the rules of evidence and exceptions to the hearsay rule, Ayria's two teenage children would be allowed to testify about events occurring on December 2, 2020, when Ayria yelled at her children to "run" because defendant purportedly had a gun. One of the teenagers would also be permitted to testify regarding witnessing defendant punch Ayria in the face on an unspecified date under MCL 768.27b. The court also, under MCL 768.27b, MRE 404(b), and MRE 803(2), permitted this teenager and Kevin's mother, Linda Hill, to testify concerning events related to an incident on November 7, 2021, that resulted in Kevin sustaining severe injures while at a hotel. Finally, the court held, under MRE 803(1) and (2), that Linda would be permitted to testify that on the morning of December 24, 2021, defendant attempted to run the victims off the road. The court excluded, among other things, Ayria's statement to her aunt that defendant was going to kill her.

[5] MCL 768.27a was amended effective April 2, 2025, and now provides:

> (1) Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence, sexual assault, or a violation of chapter LXVII or chapter LXVIIA of the Michigan penal code, 1931 PA 328, MCL 750.448 to 750.462 and 750.462a to 750.462h, evidence of the defendant's commission of other acts of domestic violence, sexual assault, or acts constituting violations of chapter LXVII or chapter LXVIIA of the Michigan penal code, 1931 PA 328, MCL 750.448 to 750.462 and 750.462a to 750.462h, is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

On appeal, defendant appears to argue that MCL 768.27b is unconstitutional because it abrogates the provisions of MRE 404(b)(1) that prohibit the admission of other crimes, wrongs, or acts, to prove the character of a person in order to show action in conformity therewith. This argument has been considered and rejected by this Court and the Michigan Supreme Court.

In *People v Watkins*, 491 Mich 450; 818 NW2d 296 (2012), the Michigan Supreme Court considered a similar constitutional challenge to MCL 768.27a, a statute that permits the admission of a prior sexual offense involving a minor for "its bearing on any matter to which it is relevant." *Id*. at 455 (quotation marks omitted). The Supreme Court held that MCL 768.27a irreconcilably conflicted with MRE 404(b), which bars the admission of other-acts evidence for the purpose of showing a defendant's propensity to commit similar acts. *Id*. at 455, 467-481. However, the Court further held that "the statute prevails over the court rule because it does not impermissibly infringe on the Court's authority regarding rules of practice and procedure under Const 1963, art 6, § 5." *Id*. at 455.

Following *Watkins*, the Supreme Court in *People v Mack*, 493 Mich 1, 2; 825 NW2d 541 (2012), considered whether MCL 768.27b, the statute at issue in this appeal, infringed on the Supreme Court's authority to establish rules of practice and procedure under the Michigan Constitution. Adopting the reasons articulated in *Watkins*, the Court held that MCL 768.27b did not infringe on the Supreme Court's authority. *Id.* In *People v Propp*, 508 Mich 374, 384; 976 NW2d 1 (2021), the Supreme Court, citing *Mack*, reiterated that "MCL 768.27b in certain instances expands the admissibility of domestic-violence other-acts evidence beyond the scope permitted by MRE 404(b)(1)." (Quotation marks omitted.)

In *People v Muniz*, 343 Mich App 437, 460-461; 997 NW2d 325 (2022), a case applicable by analogy, this Court rejected the defendant's due-process challenge to MCL 768.27a. This Court stated:

> Defendant also argues that allowing the testimony of the complainant to include his alleged past acts of sexual abuse against her violated his due-process right to a fair trial because the "other acts" testimony served as evidence of defendant's propensity to commit the crime charged and allowed the jury to convict him on that basis. Although MCL 768.27a allows the jury to consider other acts of CSC [criminal sexual conduct] as evidence of a defendant's character and propensity to commit CSC, it does not lower the quantum of proof or probative value of the evidence that the prosecution must present for conviction of the crime charged. [*People v Pattison*, 276 Mich App 613, 619; 741 NW2d 558 (2007)]; *People v Schultz*, 278 Mich App 776, 778-779; 754 NW2d 925 (2008). For these reasons, it was not fundamentally unfair to allow the complainant to testify about defendant's other acts of CSC against her. [*Muniz*, 343 Mich App at 460-461.]

Considering the foregoing authority, defendant's assertion that MCL 768.27b is unconstitutional as violative of due process lacks merit. The statute reflects the Legislature's policy decision to allow juries to consider other-acts evidence for propensity purposes in certain cases. *People v Cameron*, 291 Mich App 599, 609-610; 806 NW2d 371 (2011). "[T]he Michigan Legislature intended to allow juries 'the opportunity to weigh a defendant's behavioral history and view the case's facts in the larger context that the defendant's background affords.' " *Id*. at 609

(citation omitted). Furthermore, the rules of evidence, particularly MRE 401 and MRE 403, provide the procedural safeguards to ensure a defendant's right to due process and a fair trial. Accordingly, we conclude that defendant's constitutional challenge to MCL 768.27b is without merit.

Affirmed.

/s/ Christopher M. Murray
/s/ James Robert Redford
/s/ Michelle M. Rick